(No. 37829.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HENRY LEE LARRY, Plaintiff in Error.

*Opinion filed March 18, 1964.—Rehearing denied May 19, 1964.*

Eugene W. Wood and Myer H. Gladstone, of Chicago, for plaintiff in error.

William G. Clark, Attorney General, of Springfield, and Daniel P. Ward, State's Attorney, of Chicago, (Fred G. Leach and E. Michael O'Brien, Assistant Attorneys General, and Elmer C. Kissane and James R. Thompson, Assistant State's Attorneys, of counsel,) for the People.

Mr. Justice Schaefer delivered the opinion of the court:

The defendant, Henry Lee Larry, was indicted upon charges of unlawful sale, possession and dispensing of heroin. After a bench trial he was convicted of unlawful possession and sentenced to the penitentiary for a term of 2 to 7 years. On this writ of error he contends that the evidence did not establish his guilt beyond a reasonable doubt.

An informer named Wright and two State narcotics inspectors, Manson and Sutherland, testified to the events that resulted in the defendant's conviction. Wright testified that he telephoned the defendant on August 13, 1960, and said that he was "ready to make up," meaning that he wanted to buy narcotics. The two men agreed to meet a short while later. Wright was searched by inspector Manson who found no narcotics and no currency, and then gave Wright $150 in marked bills to be used for the anticipated purchase. Wright went to the designated meeting place. There he gave the $150 to the defendant and was told to phone the latter's home in about 90 minutes. Wright was again searched by the officers and found to have neither money nor narcotics. Manson, who had followed Wright, testified that he saw the defendant receive the money from Wright.

The defendant and Wright met the following day at Giles Avenue and Pershing Road, also known as 39th Street. Wright testified that he and the defendant had

agreed in a telephone conversation on the morning of August 14 that they would meet in the Four Aces Lounge, located at 39th and Giles, at about 12:00 or 12:30 P.M. After Wright was searched and found to have no narcotics, he was taken by inspectors Manson and Sutherland to the vicinity of the Four Aces Lounge. He testified that he waited in the lounge from 12:30 until about 2:30 P.M. and then went outside. After some time the defendant appeared, and the two men walked north on Giles Avenue to the corner of an alley where the defendant pointed to an aluminum foil package on the ground beside a building and said, "There it is." Wright picked up the package, walked south to 39th Street and took a jitney cab to 47th Street where he was joined by Manson and Sutherland. The contents of the package were tested and found to contain heroin.

Inspector Manson testified that after taking Wright to the Four Aces Lounge he parked his car on 39th Street west of Giles. From there he could see the northeast corner and the alley approximately 30 yards north of it. Manson said that at about 2:45 P.M. he saw the defendant get out of the same car that he had driven the previous day, walk to the mouth of the alley and drop a small package. No other cars were parked on Giles at that time. Manson further testified that the defendant then met Wright, and the two men walked to the mouth of the alley where the defendant nodded his head and pointed to the ground. Wright picked up the package and walked to 39th Street and entered a jitney. Inspector Sutherland who had accompanied Manson on the afternoon in question testified that he had observed each of these acts.

The defendant admits that he met Wright on August 13th and 14th, but he says that the latter meeting was fortuitous and that he agreed to the former only because he interpreted the offer to "make up" as a suggestion that they settle a prior misunderstanding. He denied that he

had been in possession of narcotics or had received money from Wright. He testified that he had met Wright when both men were in the penitentiary; that about August 10, 1960, Wright came to him in the poolroom where he worked, and insisted that the defendant get him some narcotics, and that when the defendant refused, the two men scuffled and Wright was put out of the poolroom. Two witnesses testified that they had seen a scuffle between Wright and the defendant in the poolroom in the early part of August.

In support of his contention that the evidence was insufficient to support his conviction, the defendant attacks the credibility of each of the principal witnesses for the prosecution. He contends that Wright's testimony is inherently unreliable because Wright was a former drug addict, who admitted that he was working as an informer "for the sole purpose of preparing a case against" the defendant. He points out that at the time of Wright's co-operation with the officers a charge of illegal possession of narcotics was pending against him, that there are internal contradictions in his testimony, and that his testimony is inconsistent with that of Manson. Finally, he argues that since Wright was not searched when he left the Four Aces Lounge and since he testified that during 1959 and 1960 he was "working around narcotics," the possibility that he obtained the package of heroin during his two-hour stay in the lounge has not been negated.

While a witness's addiction to narcotics has an important bearing upon his credibility, (*People* v. *Boyd,* 17 Ill.2d 321; *People* v. *Hamby,* 6 Ill.2d 559,) it does not follow that his testimony must always be disbelieved. The credibility of a drug addict, like that of other witnesses, is primarily a question for the trial court, (*People* v. *Barney,* 15 Ill.2d 503; *People* v. *Faulkner,* 12 Ill.2d 176), although drug addiction is a factor that must be considered. *People* v. *Bazemore,* 25 Ill.2d 74, on which the defendant relies,

differs from this case in that Wright's testimony, unlike that of the informer in *Bazemore,* was corroborated.

Wright was, however, a most unsatisfactory witness, and as the People concede, his testimony was "at times, confused and contradictory." He testified on direct and cross-examination that he initiated his negotiations with the defendant by saying that he wanted "to make up," and he explained, in response to questions by the trial judge, that the term was commonly used and that it meant, "You are ready to make a narcotic buy." But on rebuttal after the defendant and his witnesses had testified to the defendant's altercation with him, he testified: "I did not at any time use the term 'make up.' He [the defendant] didn't." Wright's testimony as to his earnings and expenditures during the period from January through August of 1960 leaves substantial doubt as to the amount and source of his income. Wright testified that he received about $25 from Manson during this period, while Manson testified that he paid him $250. His testimony, uncorroborated, would not sustain a conviction.

But the defendant's conviction does not rest solely upon the testimony of Wright. The defendant admitted that he was with Wright at the critical times and places. And both Manson and Sutherland testified that they saw the defendant drop the package of narcotics, meet the defendant and walk with him to the alley where he pointed it out to Wright, who picked it up. Their credibility is also attacked, primarily because of the following discrepancies in their testimony. Manson testified that he delivered the package that he received from Wright to John Endriz, a Federal chemist, and that Endriz gave him a receipt for it. Endriz testified, however, that he did not receive the package from Manson, but that it was received by another Federal chemist employed in the same office. Sutherland testified on cross-examination that he could not remember how long Wright had waited inside the lounge. Later he testified in response

to a question from the court that he thought Wright had been in the lounge for about ten minutes and that the entire transaction had taken about half an hour.

The State concedes that Manson was mistaken as to the identity of the chemist, and it is apparent that Sutherland underestimated the time that elapsed. But it can hardly be said that these discrepancies required the trial judge to disbelieve the testimony of both officers concerning the transfer of the package of narcotics. Nor does the failure of the police to search Wright when he left the Four Aces Lounge render their surveillance inadequate. Police surveillance may be adequate to support an informer's testimony although it does not exclude every alternative explanation for the acquisition of narcotics, (see *People* v. *Faulkner,* 12 Ill.2d 176; *People* v. *Hamby,* 6 Ill.2d 559) particularly where, as here, any such explanation would be inconsistent with the observed conduct of the defendant.

The judgment of the criminal court of Cook County is affirmed.

*Judgment affirmed.*