2019 IL App (1st) 150823
No. 1-15-0823

SECOND DIVISION
March 12, 2019

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | Of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | No. 12 CR 15822 |
| v. | ) | |
| | ) | The Honorable |
| ABED OTHMAN, | ) | Diane G. Cannon, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Justice Walker concurred in the judgment and opinion.
Presiding Justice Mason concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1    In 2008 Motassem Said (Said) was murdered. In a jury trial his nephew, Abed Othman,

(Othman) was found guilty of the murder. Othman was 17 years old at the time of the crime.

The trial court sentenced Othman to 30 years in prison for first degree murder plus a 25-year

weapons enhancement. Othman will be 76 when he is released.

¶ 2    On appeal, Othman contends (1) that the evidence did not prove him guilty beyond a

reasonable doubt; (2) that (a) the trial court committed error by allowing hearsay testimony

that Othman possessed a gun two years after the murder and (b) the trial court erred when it instructed the jury that Othman's gun possession two years after the crime could be considered only for the purpose of intent; (3) that Othman was denied a fair trial when, in direct violation of the trial court's express ruling, the prosecutor , during closing argument, stated that the reason Othman did not admit to the shooting during a conversation with a visitor who was wearing a wire, was because Othman knew the visiting area of the prison was bugged; (4) that the trial court erred in the manner in which it conducted an inquiry of the prospective jurors under *People v. Zehr*, 103 Ill. 2d 472 (1984); (5) that trial counsel provided ineffective assistance of counsel by failing to object to (a) the hearsay testimony of Said's girlfriend, Janice Lloyd (Lloyd), that "friends in the neighborhood" told her that Othman shot the victim and (b) the prosecutor's comments in closing that Mansour could not record a confession because Othman was worried that the visitor area of the prison was bugged; (6) that Othman's 55-year sentence is a *de facto* life sentence and is unconstitutional when imposed for a crime committed when Othman was 17; and (7) that Othman is entitled to a new sentencing hearing under section 5-4.5-105 of the criminal code because the firearm enhancement is procedural and therefore retroactively applied to cases on direct appeal. We reverse and remand for a new trial.

¶ 3                                    I. BACKGROUND

¶ 4        On April 29, 2008, police officers found Said dead from three gunshot wounds to his head, in a parking lot near 63rd Street and Spaulding Avenue in Chicago. The victim lived in the basement of the building at 3257 W. 63rd Street, Chicago. Othman's uncle, Hamdi, owned and operated a bakery in the same area. Sergeant John Foster (Foster) of the Chicago Police Department interviewed people in the area late that afternoon. Margaret Biggs (Biggs)

2

told Foster she heard some loud pops, but she had no other useful information. After more than a month of searching, Foster found and interviewed Janice Lloyd, Said's girlfriend.

¶ 5 Four years later, in August 2012, police charged Said's nephew, Othman, with murdering Said. Othman filed a motion *in limine* to bar the prosecution from presenting evidence that in 2010, two years after Said's murder, Othman asked a woman to carry his gun in her purse. The prosecutor explained that he intended to present the testimony to bolster the credibility of a jailhouse informant, who claimed that Othman told him he killed a man during 2008, in the vicinity of 63rd Street and Spaulding Avenue. The informant told police Othman also said that in 2010 he asked his girlfriend to carry a gun for him. The court denied the motion *in limine* and said, "I'll give a *limine* instruction to the jurors that they are not to consider that for incorrect purposes."

¶ 6 The trial court, in an attempt to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), which codified *Zehr*, said to the venire:

> "[T]he defendant is presumed innocent of the charges against him. The State has the burden of proving him guilty beyond a reasonable doubt. Is there anybody who disagrees or could not follow that proposition of law?
>
> No response.
>
> The State has the burden of proving him guilty. He does not have any burden upon himself to prove himself innocent. Do you understand?
>
> Everyone indicates yes.
>
> Is there anyone who does not believe in that principle of law?
>
> No response.

*** Is there anybody in the jury box who would hold it against him if he exercised his right not to testify?

No response."

¶ 7     Defense counsel did not object.

¶ 8     At trial, Lloyd testified that on April 28, 2008, the day before Said died, Othman came to the apartment Lloyd shared with Said. Othman showed Lloyd that he had a gun. Othman and Said went to buy alcohol, marijuana, and crack cocaine. The three of them shared the alcohol and marijuana. Othman bought crack and gave it to Lloyd and Said for Said "to sell to make some money." Both Lloyd and Said were addicted to crack. Later that day, Lloyd and Said used the crack. Lloyd gave $80 to Said to pay for the drugs. Lloyd testified that Othman "got mad that [Lloyd] gave [Said] the money," and Othman wanted more money from Said. Lloyd left while Othman and Said argued. She returned and spent the night with Said. She testified that Said did not leave the apartment between the time they went to sleep and the following morning, when Othman woke them up.

¶ 9     Lloyd testified that when she woke up on April 29, 2008, around 10 a.m., she tried to wake Said, but he did not get up. They stayed in bed. Othman came into the apartment and woke them around 11 a.m., pointing the gun at them and demanding money. Lloyd said, "Don't point that gun at me." Othman said to her, "Well, you better get out of here." Said went upstairs to another apartment and got "[a]bout eight dollars" from a neighbor. Said gave the cash to Othman, who said, "What's this sh**? You owe me 40 dollars. What's this sh**? I want my money." Lloyd then left. She made a phone call "to get some money." She admitted that "every morning [she] wake[s] up, [she would] try to get some money to get

4

crack." She did not contact police. She testified that when Othman pointed the gun at her, she "wasn't afraid. [She] had no reason to be afraid."

¶ 10 The prosecutor elicited the following testimony:

"Q. *** Did you find out later that day that something happened to [Said]?

A. Yes.

Q. What did you find out?

A. That [Othman] had shot him.

Q. How did you find out?

A. Friends told me in the neighborhood."

¶ 11 Defense counsel did not object.

¶ 12 Mohammed Alkhatabeh (Alkhatabeh), testified that he lived in the same building as Said, that Said lived in the basement, and that around 7 a.m. on April 29, 2008, he saw Said outside, near 63rd Street and Spaulding Avenue. Around noon Alkhatabeh was walking up the stairs to his apartment and passed Othman, who was walking down the rear stairs in the building carrying a black garbage bag. Although Othman did not live in the area, Alkhatabeh saw him frequently, often with Said. Alkhatabeh testified that usually, Othman greeted Alkhatabeh, but on April 29, Alkhatabeh "said 'hello' to him and he just kept going." According to Alkhatabeh, Othman "didn't appear natural, not the same." A few minutes later, Alkhatabeh found out from his neighbor, Hamdi, that Said had died.

¶ 13 A neighbor, Margaret Biggs, testified that around 10:30 a.m. on April 29, 2008, she heard a sound like firecrackers going "Pop, pop, pop."

¶ 14 Foster testified that when he interviewed Biggs in 2008, she told him she heard four loud pops, not three, at approximately noon.

¶ 15 Foster testified that he found only men's clothing, no women's clothing, in the apartment Lloyd said she shared with Said. He testified that he saw shell casings outside the apartment but did not find any expended shell casings inside the apartment. When Foster finally found and interviewed Lloyd in June 2008, Lloyd did not tell him that Othman had a gun. She never said that Othman bought crack for Said to sell. Although Lloyd told Foster that she had smoked marijuana with Said and Othman on April 28, she did not mention the use of crack.

¶ 16 Forensic Investigator William Moore (Moore) testified that he went to an alley at 3245 W. 63rd Street, Chicago, and found two expended .25-caliber cartridge casing, but did not find a firearm at the scene.

¶ 17 Forensic specialist Fred Tomasek (Tomasek) testified that he examined the two .25-caliber casings and determined that their class characteristics were similar and that they had been fired from the same gun.

¶ 18 No weapon was submitted in connection with this case. No physical evidence linking Othman to the weapon used in the shooting was offered.

¶ 19 Beatriz Herrera (Herrera) testified that Othman was her boyfriend in 2010, and she lived with him for four weeks. At that time, two years after the murder, Othman owned a gun. Othman told Herrera to put the gun in her purse. She testified that their friend, Matthew Fernandez (Fernandez), drove Othman and Herrera to a pawnshop, but Othman decided not to pawn the gun. Othman went to jail for burglary later in 2010.

¶ 20 Fernandez testified that Othman came to Fernandez's home on April 29, 2008, and asked to stay overnight. Othman told Fernandez that he had gotten into a struggle with his uncle, and when his uncle tried to grab Othman's gun, the gun fired, killing his uncle. Fernandez did not let Othman spend the night. Fernandez admitted that in 2010 he had a brief sexual

6

relationship with Herrera. Fernandez told Herrera she "shouldn't be with" Othman. He testified that he never drove Herrera and Othman to a pawnshop. Fernandez did not tell police about either conversation until police questioned him in 2011.

¶ 21    Eliya Mansour (Mansour) testified that he met Othman in Cook County jail in 2010. Mansour testified he had two forgery convictions. In 2010 prosecutors jailed him on a charge of felony theft. Mansour befriended Othman while they were both at Cook County jail, and between July 24, 2010, and October 9, 2010, they often spoke together in Arabic. Mansour testified that, in one conversation, Othman said, "did you ever see a human brain coming from the back of a head?" Othman told Mansour that "a couple years before" 2010, in "Crown Town," "he shot somebody in the head three times and seen his brain coming out." The area called Crown Town includes 63rd Street and Spaulding Avenue.

¶ 22    According to Mansour, Othman told him that after he shot the victim, he took the victim's wallet, which held $50; that Othman said he put the gun in a wall; that Othman said he walked to the YMCA, where he urinated on his hands to remove the gun powder residue; and that he later retrieved the gun and found it somewhat rusted. Mansour did not indicate that Othman told him when between the time of the crime in 2008 and their discussion in 2010 Othman retrieved the gun. Mansour said that Othman told him that he sold the gun to a friend. Mansour also said that Othman told him about his girlfriend, Herrera, and said he once asked Herrera to carry a gun.

¶ 23    In August and September 2010, Mansour wrote to a police officer, telling the officer that he wanted special consideration in exchange for information he could provide about a murder. Prosecutors agreed to reduce Mansour's theft charge to a misdemeanor, and the court sentenced him to supervision on that charge. The State gave Mansour more than $2000

7

for relocation and other expenses, $200 for residential living assistance, $150 for emergency living expenses, $20 to pay a check cashing fee, $150 for moving expenses, $550 for the first month's rent, and $1100 to pay the security deposit. He received supervision on a plea agreement on a theft by deception charge, which was reduced to a misdemeanor on November 20, 2011. After Mansour finished serving his time in jail, he went to visit Othman in prison while wearing a wire. Othman did not discuss the 2008 shooting, but he mentioned that a court sentenced Othman's cousin Rasheed to 15 years in prison for a shooting. In total Mansour received $2170 from the state's attorney and generous consideration on a pending felony charge. Mansour admitted that in addition to Othman, he was also trying to befriend and then "snitch" on two other inmates while incarcerated at Cook County jail.

¶ 24    Detective Dale Potter (Potter) testified that in February 2010, Othman was a suspect but had not been arrested. In late 2010, Potter heard from the state's attorney's office that a person named Eliya Mansour claimed to have information about Said's homicide.

¶ 25    Dr. Steven Cina (Cina), the chief Cook County Medical Examiner, testified that there were three gunshot wounds to Said's head, that three small-caliber, jacketed bullets were recovered from inside the victim's head, that the cause of death was multiple gunshot wounds, and that the manner of death was homicide.

¶ 26    The prosecution presented investigator John O'Connell (O'Connell) in an effort to bolster Mansour's credibility. O'Connell checked weather records and found that about three-fourths of an inch of rain fell at Midway Airport on May 2, 2008, just three days after the fatal shooting. The prosecutor argued that the evidence corroborated Mansour's testimony that Othman said when he retrieved the gun he left in a wall, he found it rusted. O'Connell found

8

a YMCA building less than two blocks from the crime scene. O'Connell also confirmed that Othman's cousin Rasheed was serving a sentence for a shooting.

¶ 27　　The defense presented no evidence or testimony.

¶ 28　　In closing argument, the prosecutor noted that Biggs testified that she heard three pops around 10:30 a.m. The prosecutor then said Biggs "told the detectives that she heard these four pops at about noon. *** So we have the shooting being about noon." Defense counsel did not object, even though no witness testified to hearing any gunshots around noon, the only testimony about gunshots put them at 10:30 a.m. Instead, the prosecutor used Biggs's statement to police as the basis for her argument that the shooting took place at noon. Although no evidence supported the assertion that the shooting took place at noon, the prosecutor improperly invited the jury to treat its impeachment of Biggs as substantive evidence that the shooting took place at noon. The prosecutor never attempted to qualify Biggs's statement to Foster as a prior inconsistent statement admissible as substantive evidence. See 725 ILCS 5/115-10.1 (West 2014).

¶ 29　　The jury found Othman guilty of first degree murder committed by personally discharging a firearm.

¶ 30　　In his motion for a new trial, Othman argued that the court committed reversible error when it denied his motion to bar evidence that two years after the murder Othman possessed a gun which, even in the State's theory, played no part in the fatal shooting. The trial court denied the motion for a new trial.

¶ 31　　At sentencing, the court chastised Othman:

"You joined [the street gang] when you were 16 years old. According to you, you terminated that four years ago. Unfortunately, by that time what you could become as a man was already set in stone, sir."

The court sentenced Othman to 30 years in prison for first degree murder, plus 25 years for using a firearm, resulting in a total sentence of 55 years. Othman now appeals.

¶ 32                                   II. ANALYSIS

¶ 33                         A. Sufficiency of the Evidence

¶ 34     Othman argues that the State did not prove him guilty beyond a reasonable doubt. No physical evidence connected Othman to the murder. No eyewitness claimed to have seen the shooting. No one saw Othman in the parking lot where the shooting occurred. Alkhatabeh saw Othman in the building around noon, which was not unusual since Othman's relative owned a restaurant in the building. Alkhatabeh said he often saw Othman in the area, so his presence has little evidentiary value. When questioned by the police, Biggs told them she heard the shots around noon on the day of the shooting; however, she testified in court that she heard them around 10:30 a.m. Othman's presence in the neighborhood two hours after the shooting suggests he felt no immediate need to leave the area. The State impeached Biggs about the time of the shooting, but presented no witness who heard shots around noon. The State's case rested almost entirely on three witnesses who admitted they knew nothing directly about the shooting. The victim, Said, was a crack user and dealer who could be expected to deal with other crack users and dealers in his area who might be expected to be armed and violent.

¶ 35     Lloyd, admittedly addicted to crack, testified that Othman brought a gun to the home she shared with Said in 2008. Othman quarreled with Said about the purchase of crack for resale.

10

When she spoke with police a month after the shooting, she did not mention the gun or the crack. She also testified that Said slept through the night of April 28-29, not waking until 11 a.m.; however, Alkhatabeh testified he saw Said in the neighborhood at 7 a.m. on April 29. Lloyd also said she lived in the apartment with Said, but Foster found only men's clothing, no women's clothing, in the apartment.

¶ 36    Fernandez testified that, on April 29, Othman came to his home and confessed to having struggled with his uncle, during which time a gun went off and killed Said. Fernandez did not contact police to tell them about the confession. Fernandez admitted that he had a sexual relationship with Herrera and advised her that she "shouldn't be with" Othman.

¶ 37    Mansour admitted that he contacted police to let them know he had information about a murder and that he traded that information for very favorable treatment. He negotiated a plea to a misdemeanor on a felony charge, obtaining a sentence of supervision, and he received more than $2000 from the State, even though he failed to induce Othman to confess when Mansour wore the wire. Part of Mansour's account conflicts with Lloyd's testimony. According to Lloyd, Said went to borrow money from neighbors and used it to pay Othman. But according to Mansour, Othman said Said had $50 in his wallet when Othman shot him.

¶ 38    Thus, the conviction rests on the impeached, conflicting testimonies of a jailhouse informant, a man who tried to separate Othman from Othman's girlfriend, and a crack addict who did not tell police about the gun or the crack when police interviewed her a month after the death of the man with whom she lived. "[W]hen it appears that a witness has hopes of a reward from the prosecution, his testimony should not be accepted unless it carries with it an absolute conviction of its truth." *People v. Williams*, 65 Ill. 2d 258, 267 (1976). "A witness can be impeached with prior silence where it is shown that the witness had the opportunity to

11

make [a] *** statement and, under the circumstances, a person normally would have made the statement." *People v. Wallace*, 331 Ill. App. 3d 822, 828 (2002). "[T]he fact a witness is a *** narcotics addict has an important bearing on his credibility." *People v. Huffman*, 177 Ill. App. 3d 713, 723 (1988). The jury must assess the credibility and the weight of testimony. *People v. Romero*, 384 Ill. App. 3d 125, 132 (2008). However, we find this jury received evidence that should not have been admitted. Therefore, we find the sufficiency of the evidence is questionable as discussed *infra*.

¶ 39                                   B. Testimony About the 2010 Gun

¶ 40      Othman contends that the trial court committed error when it permitted the State to present evidence that in 2010, two years after the murder, Othman possessed a gun unrelated to the murder and asked his girlfriend to carry it in her purse.

¶ 41      The State argued that Othman's 2010 possession of the gun corroborated Mansour's testimony. The trial court held that Othman's possession of a gun in 2010 provided admissible evidence of his intent in 2008. The State relied on Mansour's testimony that Othman told him he sold the fatal gun in 2008, and therefore the gun he possessed in 2010 was not the gun used to fire the fatal bullets. But "evidence of other crimes is not admissible to bolster the credibility of a prosecution witness." *People v. Thingvold*, 145 Ill. 2d 441, 459 (1991). In this case, as in *People v. Jackson*, 154 Ill. App. 3d 241 (1987), the gun about which Herrera testified "was not involved in the crime. [Citations.] The potential for prejudicial inferences to be drawn from such a weapon in evidence far exceeds any legitimate purpose identified by the State in the present case and must be condemned." *Id.* at 246.

¶ 42      If Herrera's testimony about the 2010 gun had not been admitted, the jury would have had a more reasonable opportunity to question Mansour's motives and credibility. When

12

hearing about the 2010 gun from both Herrera and Mansour, the jury could reasonably believe that Othman did confess to Mansour and that Mansour truthfully recalled the confession. The jury was led to believe that Othman possessed a gun at two different times in the past. There was never any descriptive information that might have shown that the 2008 and the 2010 guns were the same; the only reason the State wanted this information admitted into evidence was to corroborate what Mansour said and, through that, to connect Othman to the actual shooting.

¶ 43     Allowing Herrera's testimony about a gun she saw in Othman's possession two years after the crime—with no other testimony about its description, size, or caliber—cannot support the trial court's decision to allow this testimony. During oral argument, the State argued:

"With regard to the other crimes evidence, again it's our position that the State introduced that not to corroborate the prosecution witness [Mansour], but to show that the Othman did in fact confess and that that confession was real and reliable."

¶ 44     At trial the State argued exactly the opposite when the prosecutor specifically called attention to Herrera's testimony about the 2010 gun and how it corroborated Mansour's testimony about what Othman told him. Herrera's testimony about the gun was highly prejudicial. Othman argues that the court committed error when it admitted into evidence irrelevant and highly prejudicial evidence of gun possession, in a case with closely balanced evidence.

¶ 45     We review the trial court's evidentiary ruling for abuse of discretion. *People v. Gregory*, 2016 IL App (2d) 140294, ¶ 24. The test is whether the decision to allow the evidence is arbitrary, fanciful, or unreasonable or when no reasonable person would take the trial court's

view. *People v. Morgan*, 197 Ill. 2d 404, 455-56 (2001). Here, the court allowed evidence that was not related to the crime charged in any possible way. The gun that Herrera said she saw in 2010 was not the gun used in 2008. We find that the trial court committed error when it allowed Herrera to testify about the 2010 gun.

¶ 46                    C. Illinois Pattern Jury Instructions, Criminal, No. IPI 3.14

¶ 47       Moreover, the trial court committed error when it gave the jury instruction pursuant to Illinois Pattern Jury Instructions, Criminal, No. 3.14 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 3.14), and limited its consideration of the gun in Othman's possession in 2010 to a question of intent only.

¶ 48       IPI Criminal 4th No. 3.14 states:

> "[1] Evidence has been received that the defendant[s] [ (has) (have) ] been involved in [ (an offense) (offenses) (conduct) ] other than [ (that) (those) ] charged in the [ (indictment) (information) (complaint) ].
>
> [2] This evidence has been received on the issue[s] of the [ (defendant's) (defendants') ] [ (identification) (presence) (intent) (motive) (design) (knowledge) (_____) ] and may be considered by you only for that limited purpose.
>
> [3] It is for you to determine [whether the defendant[s] [ (was) (were) ] involved in [ (that) (those) ] [ (offense) (offenses) (conduct) ] and, if so,] what weight should be given to this evidence on the issue[s] of _____." IPI Criminal 4th No. 3.14.

The Committee Notes state: "The Illinois Supreme Court has made clear that evidence of other crimes is admissible if it is relevant to establish any fact material to the case other than propensity to commit crime." IPI Criminal 4th No. 3.14, Committee Note. See *People v. Stewart*, 105 Ill. 2d 22, 62 (1984).

14

¶ 49    The State acknowledged at oral argument that the instruction was wrong:

> "With regard to the IPI, we do recognize that the intent was a misstatement, that it was not offered on any point of intent."

The court told the jury to use this information for intent only. The jurors heard Lloyd say that Othman came over with a gun and threatened her and Said with it in 2008. They heard Herrera say Othman had a gun in 2010. A reasonable jury, given that instruction, could make a reasonable decision that if Othman had a gun in 2008, and again in 2010, he must have intended to use it.

¶ 50    But the State was not done. In oral argument, the State offered this explanation:

> "But if you read the instruction as a whole, you look at it that it did alert the jury to the fact that they were to use that evidence not to show propensity. But it was only to be a limited way to view the evidence. At one point the court was trying to insure that the jury would not consider it for anything other than what we had introduced it. It was not to be considered for propensity that this person is a badperson. *** Did it cause confusion? It may have caused confusion, but when you read it as a whole, it did not violate Othman's rights because it did not tell the jury that they couldn't consider it that Othman is a bad guy with a propensity to commit other crimes."

¶ 51    This explanation seems to acknowledge that the jury *could* consider the possession of a gun in 2010 as evidence of Othman's propensity to commit other crimes—exactly what the court's instruction ("only for intent") told the jury not to do.

¶ 52    The State suggests that Herrera's testimony about the gun proves that Mansour was telling the truth that Othman confessed to him because Othman allegedly talked about the 2010 gun and Herrera talked about the 2010 gun. The State insists that the Herrera testimony

15

about that gun was not to prove that the confession to the murder described by Mansour was true, but that Mansour truthfully relayed what Othman said. This suggestion is not complete, especially when you consider that Mansour was cutting a deal for himself and had plenty of time to get briefed on a story line between the time he asked for his deal and the time of the trial. Mansour was essential to the State because he connected Othman to the crime, when nothing else did. But Mansour was a jailhouse snitch, convicted of previous felonies, searching out gullible Arab-speaking inmates. His goal was to rack up enough information to get his deal, and it worked. However, that does not mean that the jury was not confused about what that 2010 gun meant.

¶ 53    This issue was preserved where defense counsel filed a motion *in limine* to prevent the testimony about the 2010 gun, objected to it at trial, and included it in the posttrial motion.

¶ 54    We find that the court committed error when it gave the jury instruction, IPI Criminal 4th No. 3.14, as a limiting instruction for intent only with respect to Herrara's testimony. The instruction was highly confusing and prejudicial.

¶ 55                    D. Prosecutor Violated Court's Ruling

¶ 56    Othman argues that he was denied a fair trial when, in closing argument, the State commented on its interpretation of Mansour's belief that he failed to obtain a taped confession out of Othman because Othman knew the prison visitor room was bugged.

¶ 57    This issue was not preserved for appellate review, and since it is unnecessary for our ultimate determination, we will not address it.

¶ 58                    E. "*Zehr* Principles"—Rule 431(b)

¶ 59    The State admits that the trial court erred when it failed to ask the venire members the eight questions required under *Zehr*:

16

"Now with regard to the *Zehr* issue, we acknowledge it was wrong and sometimes you are at a loss. Judges might have all those things there, and we wish she would read of them, but in this case the Judge did tap on a couple of those *Zehr*, but she did not say it and we acknowledge it."

¶ 60 In criminal trials, Illinois judges are required to ask the venire eight simple questions: (1) defendant is presumed innocent: (a) do you understand that? (b) do you accept it?; (2) defendant is not required to offer any evidence on his own behalf: (a) do you understand that? (b) do you accept it?; (3) defendant must be proved guilty beyond a reasonable doubt by the State: (a) do you understand that? (b) do you accept it?; and (4) the failure of defendant to testify on his own behalf cannot be held against him: (a) do you understand that? (b) do you accept it? Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 61 The court failed to properly read the eight questions. The court stated:

"[t]he Defendant is presumed innocent of the charges against him. The State has the burden of proving him guilty beyond a reasonable doubt. Is there anybody who disagrees or could not follow that proposition? No response. The State has the burden of proving him guilty. He does not have any burden upon himself to prove himself innocent. Do you understand? Everyone indicates yes. Is there anyone who does not believe in that principle of law? No response. *** Is there anybody in the jury box who would hold it against him if he exercised his right not to testify? No response."

¶ 62 Here, the court conflated the first and third principles: (1) Othman is presumed innocent and (3) the State has to prove him guilty beyond a reasonable doubt. The court did not ask if the venire understood the first principle that Othman is presumed innocent. It did ask if the

17

venire understood the second principle that Othman is not required to present any evidence on his own behalf, but failed to ask if the venire accepted that principle.

¶ 63   The court did correctly cover the third principle, that the jury both understood and accepted that the State must prove Othman guilty beyond a reasonable doubt. However, the court did not ask if the jury understood the fourth principle, that Othman's failure to testify on his own behalf cannot be held against him.

¶ 64   The *Zehr* court itself was emphatic on the necessity of asking the eight questions:

> "We are of the opinion that essential to the qualification of jurors in a criminal case is that they know that a defendant is presumed innocent, that he is not required to offer any evidence in his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify in his own behalf cannot be held against him. If a juror has a prejudice against any of these basic guarantees, an instruction given at the end of the trial will have little curative effect. *** We agree *** that '[e]ach of these questions goes to the heart of a particular bias or prejudice which would deprive defendant of his right to a fair and impartial jury' [citation] ***." *Zehr*, 103 Ill. 2d at 477.

¶ 65   The court failed to ask if the jury understood principles one and four or if it accepted principle two. That is three out of eight questions, or 37.5% error rate. When a defendant's liberty interest is at stake, asking all eight questions is not an unreasonable burden, even on a seasoned and busy judge. Furthermore, by failing to ask jurors if they understood the cornerstone principles of Othman's right to a just and unbiased jury, the court failed to give any juror the chance to admit that he or she did not understand the principle, so it could be

18

cleared up or so the juror could be dismissed. Whether or not a single juror understands both the words and the implication of the principles is foundational to justice.

¶ 66    Othman admits that his counsel did not object to the trial court's questions. Othman asks us to address the issue as plain error. Where the errors in evidence admitted produced a false impression of the facts, and there is ineffective assistance of counsel, this case possibly could have had a different result. When we look at whether a case is closely balanced, the tendency is to look at the same information the jury had to decide. But there is another, important consideration: what if we look at what the jury did not have, but should have had, and/or what the jury did have, but should not have had? The analysis becomes much broader when the errors of the court and ineffective assistance of counsel are also considered. The dissent argues that this case is not closely balanced because Othman presented no evidence.

¶ 67    We disagree.

¶ 68    Othman has a constitutional right not to present evidence and not testify. The evidence can be closely balanced where the evidence comes from unreliable witnesses who offer conflicting accounts or from prosecution witnesses who provide evidence favorable to Othman. Even when the defense presents no evidence, the case can still be closely balanced. Our supreme court has ruled on this issue in *Piatkowski*:

> "As to whether the evidence is nevertheless closely balanced, we begin by noting that defendant presented no alibi and no evidence whatsoever other than the testimony of Detective Sobolewski. But that is not fatal to his argument. Although defendant has the burden before this court to show that the evidence is closely balanced, he had no burden to present any evidence or to testify himself at trial." *People v. Piatkowski*, 225 Ill. 2d 551, 567 (2007).

In this case we find that the quantum of admissible evidence presented by the State against Othman rendered the evidence closely balanced. Where Othman has shown that the evidence was closely balanced, "prejudice is not presumed; rather, '[t]he error is actually prejudicial.' " *People v. Sebby*, 2017 IL 119445, ¶ 51 (quoting *People v. Herron*, 215 Ill. 2d 167, 193 (2005)).

¶ 69                                    F. Ineffective Assistance of Counsel

¶ 70        It is well-established that every person charged with a crime has a constitutional right to receive effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Strickland v. Washington*, 466 U.S. 668, 685 (1984). The right to effective assistance of counsel entails "reasonable, not perfect, representation." *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 79. To prevail on a claim of ineffective assistance of trial counsel, Othman must satisfy the two-prong test set forth in *Strickland* and establish that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced Othman. *People v. Albanese*, 104 Ill. 2d 504, 525 (1984); *People v. Baines*, 399 Ill. App. 3d 881, 887 (2010). With respect to the first prong, Othman must overcome the "strong presumption" that counsel's action or inaction was the result of sound trial strategy. *People v. Jackson*, 205 Ill. 2d 247, 259 (2001); *People v. Shelton*, 401 Ill. App. 3d 564, 583-84 (2010). " 'In recognition of the variety of factors that go into any determination of trial strategy, *** claims of ineffective assistance of counsel must be judged on a circumstance-specific basis, viewed not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions on review.' " *Wilborn*, 2011 IL App (1st) 092802, ¶ 79 (quoting *People v. Fuller*, 205 Ill. 2d 308, 330-31 (2002)). To satisfy the second prong, Othman must establish that but for counsel's unprofessional errors,

20

there is a reasonable probability that the trial court proceeding would have been different. *People v. Peeples*, 205 Ill. 2d 480, 513 (2002). A reviewing court must consider the attorney's overall performance when determining whether counsel's conduct prejudiced Othman. *People v. Mitchell*, 105 Ill. 2d 1, 15 (1984); *In re Denzel W.*, 237 Ill. 2d 285, 299 (2010); *People v. Roper*, 116 Ill. App. 3d 821, 825-26 (1983). A defendant must satisfy both the performance and prejudice prongs of the *Strickland* test to prevail on an ineffective assistance of counsel claim. *People v. Evans,* 209 Ill. 2d 194, 220 (2004); *People v. McCarter*, 385 Ill. App. 3d 919, 935 (2008).

¶ 71 Othman argues that his counsel provided ineffective assistance by failing to object to the prosecutor's deliberate elicitation of highly prejudicial hearsay that Lloyd found out, from friends in the neighborhood, that Othman killed Said.

¶ 72 The parties do not contest the applicable principles.

"To establish a claim of ineffective assistance of trial counsel, [Othman] must show that his attorney's performance was deficient and that he suffered prejudice as a result, *i.e.*, there was a reasonable probability that but for counsel's deficient performance, the result of the proceedings would have been different. [Citation.] The decision whether to object to the admission of evidence is generally a strategic one that may not form the basis of a claim of ineffective assistance of counsel. [Citation.]" *People v. Smith*, 2014 IL App (1st) 103436, ¶ 63.

"The constitutional guarantee of effective assistance of counsel requires a criminal defense attorney to use the applicable rules of evidence to shield his client from a trial based upon unreliable evidence." *People v. Fillyaw*, 409 Ill. App. 3d 302, 315 (2011).

21

¶ 73    The State used Lloyd's testimony that she heard from friends in the neighborhood that Othman killed Said. Defense counsel did not object, thereby allowing the State to inject prejudicial hearsay that some other witnesses would also testify that Othman committed the crime. This set of mystery, anonymous witnesses could not be cross examined, nor could their credibility be considered by the jury. The jury could easily have believed that there were other, actual witnesses who implicated Othman, which could have been a significant factor in the jury's determination that Othman was guilty.

¶ 74    Admitting the Lloyd hearsay with no objection from counsel denied Othman his basic right to challenge the State's case. It cannot be viewed as a strategic decision under any reasonable circumstance and was prejudicial. We find that Othman received ineffective assistance of counsel when counsel did not object to Lloyd's hearsay statement.

¶ 75    The cumulative effect of the prejudicial Herrera testimony—layered on the erroneous and highly confusing jury instruction, the admission of the Lloyd hearsay testimony, the ineffective assistance of counsel, and the problematic *Zehr* questioning—resulted in an unfair trial. We remand for a new trial. We next consider Othman's remaining arguments.

¶ 76                              G. Unconstitutional Sentence

¶ 77    Othman argues that his 55-year sentence is unconstitutional because (a) it is a *de facto* life sentence; (b) it violates the Illinois proportional penalties clause; (c) Othman was a juvenile tried as an adult, and the adult sentencing scheme in place included, as part of the Corrections Act, the Truth in Sentencing Act, which effectively prevents Othman from ever showing that he is rehabilitated, and as such is unconstitutional as applied to him and to similarly situated juvenile defendants; and (d) the firearm enhancement was not mandatory

but was discretionary under changes in the law that are retroactive for cases already on direct appeal, such as this case.

¶ 78                                   1. *De facto* Life Sentence

¶ 79        Othman will be released from prison when he is 76 years old. The court in sentencing admonished Othman: "You joined the [gang] when you were 16 years old. According to you, you terminated that four years ago. Unfortunately, by that time what you could become as a man was already set in stone, sir." By this statement, the court demonstrated that it was closed to the idea of rehabilitation for Othman. Yet, our State and all applicable precedent require an analysis of a defendant's potential for rehabilitation if he or she was a juvenile at the time of the crime. Othman was 17 years old on April 29, 2008, when Said was killed, and he was 19 when he was arrested on August 8, 2010.

¶ 80        The court did not make a specific finding that Othman was among "the rarest of juvenile offenders *** whose crimes reflect permanent incorrigibility." (Internal quotation marks omitted.) *People v. Ortiz*, 2016 IL App (1st) 133294, ¶ 23. The "set in stone" comment from the judge was a strong statement, to be sure. But it does not reflect the kind of analysis that is expected when sentencing a juvenile, even a juvenile found guilty of murder. The court gave no indication that it considered the impetuous, reckless, and shallow thinking of any 17-year-old boy. In fact, the court, by acknowledging that Othman joined the gang when he was 16, indicated the very reason this sentence is wrong: 16-year-old children have brains that are not fully developed; hence, they do irrational things. Any parent or teacher knows that 16-year-old boys do unreasonable things like join gangs. When they get older, some of them leave the gangs, as did Othman. On the one hand, he was being literally condemned for joining the

23

gang at a young age. On the other hand, he was given no credit for leaving the gang also at a young age. If joining the gang sets his life "in stone," then what must leaving the gang do?

¶ 81 We agree that the sentence is a *de facto* life sentence that cannot stand constitutional or precedential muster.

¶ 82        2. Proportionate Penalties Clause

¶ 83 Othman also argues that the sentence does not meet the requirements of the proportionate penalty clause of the Illinois Constitution: "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11.

¶ 84 In a thread of cases, this court has determined that the effect of the statutory mandatory firearms enhancement in sentencing offenders who were juveniles at the time of the crime interfered with the judge's discretion and violated the proportionate penalties clause of the Illinois Constitution because it "shocks our evolving standard of moral decency." *People v. Aikens*, 2016 IL App (1st) 133578, ¶ 37.

¶ 85 In *Miller*, a 15-year-old was sentenced to 52 years in prison for two murders. *People v. Miller*, 202 Ill. 2d 328, 330 (2002). In *Gipson*, the defendant was subject to a mandatory 52-year sentence for personally discharging a firearm and inflicting severe bodily injury. *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 78, *appeal dismissed*, No. 119594 (Ill. May 11, 2017). In *Aikens*, a 15-year-old was subject to a mandatory 40-year sentence for personally discharging a firearm while attempting to kill a police officer. *Aikens*, 2016 IL App (1st) 133578, ¶ 1. All of these cases follow the logic of the United States Supreme Court in its *Miller*, *Roper*, and *Graham* trilogy, and all lead to the same conclusion: juvenile offenders, no matter how serious the offense, and absent a specific finding that the juvenile offender is

24

totally irredeemable and unable to be rehabilitated, must be given some opportunity to present to the parole board some evidence of rehabilitation at some time during their sentence. See *Miller v. Alabama*, 567 U.S. 460 (2012); *Roper v. Simmons*, 543 U.S. 551 (2005); *Graham v. Florida*, 560 U.S. 48 (2010).

¶ 86 We agree that Othman's sentence does not meet the standards set by the proportional penalties clause of the Illinois Constitution as applied to juvenile offenders.

¶ 87 3. The Discretionary Firearm Enhancement Is Retroactive to Othman's Case

The Unified Code of Corrections, section 5-4.5-105, provides new sentencing procedures for offenders who were juveniles at the time of the offense. 730 ILCS 5/5-4.5-105 (West 2016). Othman argues that since this is clearly procedural, it is retroactive to cases pending direct appeal, as Othman's is. The court may now "in its discretion, decline to impose any otherwise applicable sentencing enhancement based upon firearm possession." *Id.* 5-4.5-105(b).

¶ 88 We agree. The legislature did not include a savings clause, and the new law does not change the elements of any offense or increase the punishment. This is clearly a procedural change and thus, it is retroactive in this case.

¶ 89 4. Truth in Sentencing Act Is Unconstitutional as Applied to Juvenile Defendants

¶ 90 Furthermore, Othman's sentence is the result of the confluence of sentencing for first degree murder, the firearms enhancement, and truth in sentencing. Pursuant to the Truth in Sentencing Act (730 ILCS 5/3-6-3(a)(2)(i) (West 2006)), Othman will serve 100% of his sentence with no possibility of parole.

¶ 91 This, as it applies to Othman and similarly situated juvenile offenders tried as adults, is unconstitutional because every major case on the issue of juvenile sentencing strongly

25

condemns sentencing policies that prevent a juvenile from seeking to demonstrate rehabilitation and parole at some point during his prison sentence.

¶ 92 An as-applied challenge arises from a defendant's contention that the statute or law as it is applied to his particular situation is unconstitutional. *People v. Martin*, 2018 IL App (1st) 152249, ¶ 11 (citing *People v. Campbell*, 2014 IL App (1st) 112926, ¶ 57).

¶ 93 The facts that surround a defendant's particular circumstances are relevant to an as-applied challenge. *Id.* ¶ 10.

¶ 94 An as-applied challenge to the constitutionality of a statute is analyzed according to well established principles:

> "Statutes are presumed constitutional, and the party challenging the constitutionality of a statute has the burden of clearly establishing its invalidity. A court must construe a statute so as to uphold its constitutionality if reasonably possible. The constitutionally of a statute is a question of law subject to *de novo* review. [Citations.]
>
> *** [A]n 'as applied' challenge protests against how a statute was applied in the particular context in which the challenging party acted or proposed to act. Accordingly, in an as-applied challenge, the challenging party's particular facts and circumstances become relevant. [Citations.] 'An as-applied challenge requires a showing that the statute violates the constitution as it applie[d] to the facts and circumstances of the challenging party.' *** [A] successful as-applied challenge enjoins enforcement of the statute only against the challenging party. [Citations.]"
> *People v. Gray*, 2017 IL 120958, ¶¶ 57-58.

¶ 95 Here, the question is whether the Truth in Sentencing Act, as applied to Othman and juvenile defendants similarly situated, is unconstitutional under the eighth amendment, which

26

prohibits governments from imposing "cruel and unusual punishments" for criminal offenses. U.S. Const., amend. VIII.

¶ 96    In a fascinating summary, the United States Supreme Court has held that:

"*Miller* *** established that the penological justifications for life without parole collapse in light of the distinctive attributes of youth. [Citation.] *** *Miller* *** rendered life without parole an unconstitutional penalty for a class of defendants because of their status—that is, juvenile offenders whose crimes reflect the transient immaturity of youth. [Citation.] ***

* * *

*** *Miller*'s conclusion that the sentence of life without parole is disproportionate for the vast majority of juvenile offenders raises a grave risk that many are being held in violation of the Constitution." (Internal quotation marks omitted.) *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 734-36 (2016).

Therefore, "*Miller* announced a substantive rule of constitutional law." *Id.* at ___, 136 S. Ct. at 736.

¶ 97    Othman did not specifically challenge the constitutionality of the Truth in Sentencing Act itself below. However, his motion to reconsider sentence does state "In sentencing Othman, the Court failed to follow Article I, Sec. 11, of the Illinois Constitution, which states as follows: 'All penalties shall be determined both according to the seriousness of the offense and with objective of restoring the offender to useful citizenship.' " And, during his argument for a lenient sentence defense counsel stated:

27

"Judge, the sentence is going to be long. We all know that. We all know the sentences are 100 percent. We have an opportunity here to give Abed some hope. *** He is a young man. He deserves [hope]. He deserves the ability to rehabilitate himself *** give Abed the ability to rehabilitate himself and some day work his way back into society."

¶ 99     We believe counsel sufficiently preserved this issue. However, even without specifically arguing below that the Truth in Sentencing Act, as part of an adult sentencing scheme, is unconstitutional, we would still consider this argument. Our supreme court has held that the constitutionality of a statute may be challenged on appeal, even if no evidentiary record was made below, if the evidentiary record is sufficient and the challenge is based on evidence already in the trial record. *Martin*, 2018 IL App (1st) 152249, ¶¶ 12-13 (citing *People v. Holman*, 2017 IL 120655, ¶ 32, and *People v. Robinson*, 2011 IL App (1st) 100078, ¶¶ 12, 17, 29). Furthermore, the constitutionality of a statute may be raised at any time. *Robinson*, 2011 IL App (1st) 100078, ¶ 12.

¶ 100     The *Montgomery* court gave states a way to resolve this situation without having to relitigate sentences by "permitting juvenile homicide offenders to be considered for parole." *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 736.

¶ 101     That is, the United States Supreme Court has told us that the Truth in Sentencing Act as it applies to Othman and similarly situated juvenile defendants tried as adults is unconstitutional as written and needs to be amended.

¶ 102     The facts in Othman's case are already in the record. He was 17 when the crime occurred; he was 24 at the time of sentencing; he was sentenced to 55 years in IDOC; he is

28

scheduled for release at the age of 76. Because of the Truth in Sentencing Act, he will serve 100% of his time.

¶ 103    The Illinois Supreme Court has not specifically ruled on the constitutionality of the Truth in Sentencing Act, standing alone, as it applies to similarly situated juvenile defendants tried as adults.

¶ 104    The Truth in Sentencing Act was fully discussed in *People v. Buffer*, 2017 IL App (1st) 142931, *pet. for leave to appeal allowed*, No. 122327 (Nov. 22, 2017), in this author's special concurrence. We quote, below, extensively from that special concurrence.

¶ 105    In the many cases discussing the impact of this State's laws on juvenile offenders, three statutes—automatic transfer, mandatory sentences, and truth in sentencing—have been considered, but the impact of truth in sentencing on juvenile offenders has largely been overlooked as a separate and distinct part of the discussion. This has led to the almost automatic assumption that the Truth in Sentencing Act is constitutional without any significant analysis of the relationship between its "serve the full sentence" mandate and the lack of opportunity for rehabilitation and parole for juvenile offenders. This inescapable relationship is why we believe the Truth in Sentencing Act is unconstitutional as it applied to Othman and similarly situated juvenile defendants tried as adults. The United States Supreme Court has made it very clear that it is the sentence without the possibility of parole that has driven the *Miller*, *Roper*, *Graham* trilogy. *Buffer*, 2017 IL App (1st) 142931, ¶ 79

¶ 106    "[T]he Truth in Sentencing Act is a stand-alone act ***." (Internal quotation marks omitted.) *Id.* ¶ 79 (Pucinski, J., specially concurring).

¶ 107    It is in the Corrections Code because it outlines how the Illinois Department of Corrections should manage its population.

"[T]he Truth in Sentencing Act requires a juvenile offender [tried as an adult and convicted of murder in the first degree] to serve 100% of this sentence. [That is, with no possibility of parole.] [Citation.]

'***

It is not a sentencing statute because it does not rely on any judge, or any court, to impose or administer it. [A] " '[s]entence' is the disposition imposed by the court on a convicted defendant." 730 ILCS 5/5-1-19 (West 2006).

It is a corrections statute because only the Department of Corrections can administer it: "The Department of Corrections shall prescribe rules and regulations for awarding and revoking sentence credit for persons committed to the Department *** a prisoner who is serving a term of imprisonment for first degree murder *** shall receive no sentence credit and shall serve the entire sentence imposed by the court." 730 ILCS 5/3-6-3(a)(2)(i) (West 2006).

We recognize that in the Rubik's cube of decision-making, a sentencing judge will, and indeed must, consider all the moving parts: the crime, the class of crime, the aggravating and mitigating factors, the legally possible sentencing range, any enhancements, any exceptions, mandatory sentencing, and what impact the Truth in Sentencing Act will have. But, that is not to say that the Truth in Sentencing Act only exists as an extension of the other sentencing factors. It has a life of its own; if it were repealed tomorrow, the rest of the sentencing statutes would still exist. It is that separate life of the Truth in Sentencing Act that is troubling where it intersects the sentencing of juvenile offenders.

One of the required filters in sentencing juveniles is, and must be, their potential for rehabilitation. It is a different prism than the potential of adult defendants for rehabilitation. The United States Supreme Court and the Illinois Supreme Court have acknowledged what every parent and every civilized society knows: children are different from adults. They have a larger and potentially unlimited ability to change as they mature, and those changes can be for the better, or unfortunately, for the worse, depending in large part on their own history when dropped into the surroundings and experiences of prison.

Indeed, the Unified Code of Corrections defines as one of the powers and duties of the Department of Corrections, the responsibility "to accept persons committed to it by the courts of this State for care, custody, treatment *and rehabilitation* ..." (Emphasis added.) 730 ILCS 5/3-2-2(1)(a) (West [Supp. 2015]).

*** [R]ehabilitation is firmly rooted in our legal history. This duty and the responsibility for rehabilitation first appeared in 1973 (Ill. Rev. Stat. 1973, [ch. 38, ¶ 1003-2-2]). Before that, beginning in 1869, the Commissioners of the Penitentiary were directed to provide "diminution of sentence if no infractions of the discipline" occurred with reductions in sentence for good conduct. The prisoner would then get a certificate of "restoration" [(1869 Ill. Laws 81 (§ 2))]. By 1880, the Commissioners were required to develop rules that "shall best conduce to the reformation of convicts" (Ill. Rev. Stat. 1880, [ch. 108, ¶ 10]) and to provide for "good time" for convicts who followed the rules (Ill. Rev. Stat. 1880, [ch. 108, ¶ 10]).

"When defining crimes and their penalties, the legislature must 'consider the constitutional goals of restoring an offender to useful citizenship and of providing a penalty according to the seriousness of the offense.['] " *People v. Leon Miller*, 202 Ill. 2d 328, 338 (2002) (quoting *People v. Taylor*, 102 Ill. 2d 201, 206 (1984)).

In *People v. Roper*, 543 U.S. 551 (2005)[,] the U.S. Supreme Court in deciding that the death penalty for juvenile offenders is unconstitutional stated: "The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed. Indeed, "the relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.' " *Roper*[, 543 U.S. at 570 (quoting *Johnson v. Texas*, 509 U.S. 350, 368 (1993))].

*Roper* continues: "It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity and the rare juvenile offender whose crime reflects irreparable corruption. As we understand it, this difficulty underlies the rule forbidding psychiatrists from diagnosing any patient under 18 as having antisocial personality disorder, a disorder also referred to as psychopathy or sociopathy, and

which is characterized by callousness, cynicism and contempt for the feelings, rights and suffering of others. If trained psychiatrists with the advantage of clinical testing and observation refrain, despite diagnostic expertise, from assessing any juvenile under 18 as having antisocial personality disorder, we conclude that States should refrain from asking jurors to issue a far graver condemnation—that a juvenile offender merits the death penalty. When a juvenile offender commits a heinous crime, the State can exact forfeiture of some of the most basic liberties, but the State cannot extinguish his life and his potential to attain a mature understanding of his own humanity." (Internal [quotation marks] omitted.) *Roper*[, 543 U.S. at 573-74].

While *Roper* was a death penalty case, and this case is not, the underlying reasoning—that most juveniles are capable of rehabilitation, that it is impossible at sentencing to predict which ones can be rehabilitated and to what degree, and that the State must provide a meaningful opportunity for juvenile defendants to demonstrate their rehabilitation at some point along the line—points in the direction of finding that the Truth in Sentencing Act, as it applies to juveniles denies them the fundamental right to demonstrate rehabilitation.

The U.S. Supreme Court expanded its analysis of juvenile offenders in *Graham v. Florida*, 560 [U.S.] 48 (2010), a life without parole case involving a non-homicide crime. "Life without parole is an especially harsh punishment for a juvenile. Under this sentence a juvenile offender will on average serve more years and a greater percentage of his life in prison [than] an adult offender. A 16-year-old and a 75-year-old each sentenced to life without parole receive the same

punishment in name only. [Citation.] This reality cannot be ignored." *Graham*[, 560 U.S. at 70]. The Court stated: "*** life without parole *** alters the offender's life by a forfeiture that is irrevocable. It deprives the convict of the most basic liberties without giving hope of restoration ***. *** [T]his sentence 'means denial of hope, it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit [of the convict], he will remain in prison for the rest of his days.' " *Graham*[, 560 U.S. at 69-70 (quoting *Naovarath v. State*, 779 P.2d 944 (Nev. 1989))].

The *Graham* court reviewed retribution, deterrence, incapacitation and rehabilitation. Regarding incapacitation the court reasoned: "By denying Graham the right to reenter the community the State makes an irrevocable judgment about that person's value and place in society. This judgment is not appropriate in light of juvenile nonhomicide offender's capacity for change and limited moral culpability. A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State must do, however, is give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. *** The Eighth Amendment *** does forbid States from making the judgment at the outset that those offenders never will be fit to reenter society." *Graham*[, 560 U.S. at 75].

Acknowledging that *Graham* concerned a nonhomicide offense, and [Othman] was convicted of first degree murder does not alter the analysis: that it is impossible for any system to determine at the outset that a juvenile offender is

34

totally irredeemable and can never be rehabilitated. The Truth in Sentencing Act as it applies to juvenile offenders does exactly that. It deprives the juvenile homicide offender any opportunity to demonstrate rehabilitation. That ignores the reality that juveniles by definition are immature and moving toward maturity. Granted, some juveniles will not be able to demonstrate maturity and rehabilitation. It is the deprivation of the chance to demonstrate fundamental change in his nature that offends our view of juveniles and justice in the same context.

Finally, the *Miller* court considered whether a sentence of life without parole for a juvenile convicted of murder was unconstitutional, and found that it violated the Eighth Amendment's prohibition against cruel and unusual punishments.

"Most fundamentally, *Graham* insists that youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole, 'An offender's age,' we make clear in *Graham*, 'is relevant to the Eighth Amendment,' and so 'criminal procedure laws that fail to take defendant's youthfulness into account at all would be flawed.[' "] *Miller*, 567 U.S. at ___, 132 S. Ct. at 2466 (quoting *Graham*, 560 U.S. at 75)].

The *Miller* court went on to analyze what it called the "confluence" of state laws and reasoned that it was the impact of several laws acting together that caused concern because it was impossible to tell if the states "actually 'intended to subject such offenders to those sentences' " or if it was just the fact that statutes in combination had the effect of life without parole for juvenile offenders. See *Miller*[, 567 U.S. at ___, 132 S. Ct. at 2473].

The Illinois Truth in Sentencing Act is a good candidate for the same reasoning: did the Illinois legislature actually intend for juveniles who are[ ] 1) transferred automatically to adult court by the charging decision of the state's attorney, with no requirement for any protocol or reason, and with no judicial review; and are then 2) subject to adult sentences, including adult enhancements; to then be 3) subject to the truth in sentencing provisions that require (for a murder conviction) they must serve 100% of their sentence with no possibility of demonstrating maturity or rehabilitation? Or was the effect of the Truth in Sentencing Act just an unintended consequence of the transfer to adult court without its own specific legislative decision making?

An analysis of the General Assemblies from the 87th (1991-1992) through the 96th (2009-2010) for relevant topics reveals that the Truth in Sentencing Act was one part of the legislature's response to a severe uptick in violent crime in the early l990's. The Congress of the United States responded with the [Violent Crime Control and Law Enforcement Act of 1994 (42 U.S.C. § 13701 (1994))]. Among other things the bill provided federal incentive money for states that adopted truth in sentencing laws in which violent offenders must serve at least 85% of their sentence. Congress dangled $3.95 billion for 1996 to 2000 in front of states that passed truth in sentencing laws. It is worth noting that former president Bill Clinton recently renounced his 1994 crime bill: "The problem is the way it was written and implemented, we have too wide a net….We have too many people in prison. And we wound up spending—putting so many people in prison that there wasn't enough money left to educate them, train the[m] for new jobs

36

and increase the chances when they came out that they could live productive lives." [http://thehill.com/blogs/blog-briefing-room-news/241247-bill-clintonrenounces-his-1994-crime-bill] (May 6, 2015). In a later CNN interview, the former president said: "In that bill there were longer sentences. And most of these people are in prison under state law, but the federal law set a trend…And that was overdone. We were wrong about that." http://www.cnn.come/2015/07/15/politics/bill-clinton-1994-crime-bill/ (July 15, 2015).

States, including Illinois, wanting to be "tough on crime" and in search of those federal dollars responded with tougher sentences, mandatory sentences, enhanced sentences, automatic transfer of juveniles to adult court for certain crimes, and the Truth in Sentencing Act.

During the debates on the various bills in the House and the Senate, the Illinois Legislature did not debate the behavioral, psychological or social characteristics of juveniles. This is not surprising since the scientific research in this area is relatively new.

And, it is clear that the legislature did not, during this time period, ever consider the result of the confluence of these tough on crime measures on juveniles. It is this intersection that is most troubling because it is when truth in sentencing is meshed with mandatory sentences and mandatory transfer to adult court that the consequences are most apparent. And those are the very same consequences on juveniles that were never specifically detailed, debated or considered when the Legislature was considering these bills.

To her credit, Rep. Barbara Flynn [Currie], in a related debate on December 1, 1994, said: "We need to find out whether we are on the right track in dealing with serious crimes committed by juveniles....we've tried, get tough. I think it's time for us to get smart..." [(88th Ill. Gen. Assem., House Proceedings, Dec. 1, 1994, at 72)].

There are other members of the Legislature that were consistent in their instinct that the tough measures being debated and passed were not necessarily the answer for juvenile crime.

More persuasive to their colleagues were those who argued for the various bills. Rep. Rosemary Mulligan, in House debates on April 7, 1995 said: "Rehabilitation is a good thing, but I think we all realize that by the time a young person has committed a crime we may have passed the point where we can rehabilitate them ...." [(89th Ill. Gen. Assem., House Proceedings, Apr. 7, 1995, at 173)]. [Citation.]

When the Truth in Sentencing Act was debated

'[t]here was no debate on the Truth in Sentencing Act that focused specifically on its impact on juveniles transferred to adult court who were then subject to mandatory sentence, or for that matter on juveniles at all. The Truth in Sentencing Act [as part of Pub. Act 89-404] became effective August 20, 1995. It was later struck down by the Appellate Court as unconstitutional because the full bill violated the single subject rule in *People v. Pitts*, 295 Ill. App. 3d 182 (1998)[.] [S]ee also *People v. Reedy*, 295 Ill. App. 3d 34 (1998)[;] *People v. Reedy*, 186 Ill. [2d] 1 (1999).

In 1998 the Illinois Legislature re-enacted the provisions of the Truth in Sentencing Act [Pub. Act 90-592] again, curing the constitutional problem, but with no specific debate on its impact on juvenile offenders who were transferred to adult court and then subject to mandatory sentences.

One example of the lack of attention to the ramifications of the intersection of these tough on crime bills appears [in the] debate to add certain sexual offenses to the truth in sentencing provisions. Rep. Hoffman asked: "What about juveniles? Does this apply to any juvenile crimes?" and Rep. Righter responded: "Only if they are tried and convicted as adults, it's my understanding." [91st Ill. Gen. Assem., House Proceedings, Mar. 9, 1999, at 6 (statements of Representatives Hoffman & Righter)]. Those three sentences can hardly qualify as robust debate. The measure passed without any more discussion.' " *Buffer*, 2017 IL App (1st) 142931, ¶¶ 80-81 (Pucinski, J., specially concurring) (quoting *People v. Taylor*, 2015 IL App (1st) 121577-U, ¶¶ 45-71).

¶ 108　What we know now about juvenile development requires a finding that the Truth in Sentencing Act is unconstitutional as applied to Othman and to similarly situated juvenile defendants.

¶ 109　We emphasize that the Truth in Sentencing Act is not unconstitutional on its face, since clearly it can be constitutionally applied to adult defendants. However, we find the specific truth in sentencing provision to which Othman was subjected (730 ILCS 5/3-6-3(a)(2)(i) (West 2006)), which precludes Othman from any possibility of early release, to be unconstitutional as it is applied to Othman and to similarly situated juvenile defendants

39

because those juvenile defendants cannot, under any circumstance, demonstrate their potential for rehabilitation at any time prior to the completion of their sentence.

¶ 110                                III. CONCLUSION

¶ 111    Because of the cumulative effect of the court's errors and the ineffective assistance of counsel, we reverse and remand.

¶ 112    Othman's sentence is a *de facto* life sentence that was based on the court's erroneous finding that when Othman joined a gang at the age of 16, his entire future was "set in stone," even though he left the gang. Othman's sentence violates the proportional penalties clause of the Illinois Constitution. Othman's sentence includes a mandatory firearm enhancement that does not conform to applicable law, since the changes in that Act as it applied to juveniles are retroactive to any case on direct appeal, as was the case here. Othman's sentence relies on an adult sentencing scheme that is impacted by the Truth in Sentencing Act, which is unconstitutional as applied to Othman and similarly situated juvenile defendants.

¶ 113    Furthermore, during Othman's sentencing hearing, the circuit court referenced Othman's decisions as a juvenile and his prior gang affiliation, stating that Othman's character was "set in stone" when in his youth, he joined a gang, while the judge knew that Othman had left the gang. We find these comments deeply troubling. We conclude that the interests of justice are best and most efficiently served by assigning this case to a different judge on remand. Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) grants a reviewing court, in its discretion, the power to reassign a matter to a new judge on remand. *Eychaner v. Gross*, 202 Ill. 2d 228, 279 (2002); *People v. Tally*, 2014 IL App (5th) 120349, ¶ 43; see also *People v. Serrano*, 2016 IL App (1st) 133493 (remanding the case to be presided over by a different judge to avoid prejudicing the defendant); *People v. McAfee*, 332 Ill. App. 3d 1091, 1097 (2002)

40

(finding that remand to a different judge for a new sentencing hearing was warranted "in order to remove any suggestion of unfairness"). Accordingly, we are remanding this case to the presiding judge of the criminal division of the circuit court for reassignment to a different judge for a new trial and, if a new conviction should result, for sentencing consistent with this opinion.

¶ 114    Reversed and remanded with directions.

¶ 115    PRESIDING JUSTICE MASON, concurring in part and dissenting in part:

¶ 116    I agree with the majority that the trial court violated Rule 431(b) in its administration of the *Zehr* principles, and the admission of Herrera's testimony that Othman asked her to carry a gun two years after the murder was error. I respectfully disagree with the majority's conclusion that the evidence here was closely balanced such that under *Sebby*, 2017 IL 119445, the Rule 431(b) error, either independently or in conjunction with the evidentiary error, mandates a new trial. Further, I disagree with the majority that defense counsel was ineffective for failing to move to strike an isolated hearsay statement, which was never mentioned again throughout Othman's trial or during closing arguments. Although the majority considers the sufficiency of the evidence "questionable" (*supra* ¶ 38) and never explicitly finds that the State's evidence was sufficient to convict, I must assume that my colleagues have resolved those doubts in favor of the State as they are not reversing Othman's conviction outright but, rather, remanding for a new trial. I would affirm Othman's murder conviction, and therefore, I respectfully dissent.

¶ 117    During Othman's murder trial, the jury heard, among other things, the following evidence: (i) at 11 am the day Said was murdered, Othman showed up in a basement space where Said lived, (ii) there was an argument between Othman and Said about money Othman

41

claimed Said owed him, (iii) during the argument, Othman pointed a gun at Said, (iv) a neighborhood resident told police she heard several "pops" around noon, (v) Othman was seen at the building shortly thereafter, (vi) Said's body was discovered in an alley beside the basement, (vii) that same day, Othman told a longtime friend that he had "accidentally" shot his uncle, (viii) after interviewing a witness to the argument between Othman and Said, police considered Othman a suspect in the murder, (ix) Othman, who had been a frequent visitor to the neighborhood because another relative owned a bakery there, was never seen in the neighborhood again following the murder, and (x) while later incarcerated on burglary conviction, Othman confessed to the murder—including where it occurred, the caliber of the weapon used, how many times he shot the victim, and where on the victim's body he was shot—to a fellow inmate with whom he had developed a close relationship. The majority finds this evidence closely balanced, not because of its content, but because the witnesses through whom it was elicited were not model citizens, a topic explored at length during Othman's trial.

¶ 118     In my view, a "qualitative, commonsense assessment" of this evidence (*Sebby*, 2017 IL 119445, ¶ 53) precludes a finding that it was closely balanced or that the errors identified by the majority had any effect on the outcome of Othman's trial.

¶ 119     I feel compelled to begin with the majority's misapplication of *Sebby*. *Sebby* was the first case to consider a defective Rule 431(b) admonishment in the context of first prong plain error. *Id.* ¶ 84 (Karmeier, C.J., dissenting). The State here concedes that the trial court's admonishment was clear error, leaving only the determination of whether the evidence was closely balanced. With little analysis, the majority concludes that it was because the State's case rested chiefly on the testimony of three witnesses whose credibility was subject to attack

42

(*supra* ¶ 38). But unlike *Sebby*, the State presented a plethora of corroborating evidence, bolstering the credibility of these witnesses, which the majority largely ignores and which I discuss in detail below. The majority's analysis portends an expansion of *Sebby* to a wide swath of cases in which the State, certainly not by choice, presents its case through the testimony of witnesses whose credibility can be attacked. Because it is undisputed that this error was not preserved, the issue is whether Othman can satisfy his burden to show why the normal rules of forfeiture should not apply. Although Othman did not have the burden of presenting any evidence or testifying himself at trial, in order to invoke plain error, he bears the burden here of establishing that the evidence was closely balanced. *Piatkowski*, 225 Ill. 2d at 567. And in this case, the "closely balanced" analysis amounts to nothing more than second-guessing the jury's credibility determinations regarding the State's witnesses.

¶ 120    To shoehorn this case into *Sebby*'s analysis, the majority attempts to posit an "equally plausible" version of events (which not even Othman's own lawyer raised at trial) by hypothesizing that Said "was a crack user and dealer who could be expected to deal with other crack users and dealers in his area who might be expected to be armed and violent" (*supra* ¶ 34). However, there is no evidence in the record, apart from Lloyd's testimony that Said was supposed to sell the crack they bought for Othman, that Said was a crack "dealer." Thus, the majority's theory is pure speculation. And just as speculation regarding alternative scenarios is insufficient to raise a reasonable doubt as to a defendant's guilt when the evidence is otherwise sufficient (*In re Jonathon C.B.*, 2011 IL 107750, ¶ 60), such speculation is insufficient to render evidence "closely balanced" for purposes of plain error review.

43

¶ 121    As a newly-crafted addition to first prong plain error jurisprudence, *Sebby* should be limited to the same or closely analogous types of cases, *i.e.*, cases in which there is (i) a credibility contest consisting of witnesses presented by both sides who provide equally plausible versions of the events, one of which is consistent with the defendant's innocence and (ii) no evidence to corroborate or contradict either version. *Sebby*, 2017 IL 119445, ¶ 62. The outcome in *Sebby* turned on a "contest of credibility," involving conflicting accounts of the circumstances of defendant's arrest from the deputies involved and defendant, as well as from several witnesses who were present. *Id.* ¶ 63. Because no extrinsic evidence was offered to corroborate or contradict either version of the conflicting accounts and both versions were credible, the court found that defendant had satisfied his burden to demonstrate that the evidence was closely balanced. *Id.* (citing *People v. Naylor*, 229 Ill. 584, 607-08 (2008)). Although *Sebby* certainly does not identify the exclusive circumstances under which evidence will be deemed closely balanced, neither does it support applying that label with a broad brush. Importantly, *Sebby* does not direct us to depart from the long established standard on review of a guilty verdict in a criminal case, *i.e.*, that we must view the evidence in the light most favorable to the prosecution (*Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Davison*, 233 Ill. 2d 30, 43 (2009) (under *Jackson*, all reasonable inferences from the record must be drawn in favor of prosecution)).

¶ 122    Applying *Sebby* here, where the State presented ample corroboration for the credibility of its witnesses, expands beyond recognition plain error as a "narrow and limited" exception (*People v. Herron*, 215 Ill. 2d 167, 177 (2005)) to forfeiture of unpreserved errors. See *Gray*, 2017 IL 120958, ¶ 51 (in criminal cases, it is the jury's function to assess the credibility of witnesses, the weight to be given to their testimony, and the inferences to be drawn from the

44

evidence). My colleagues identify "weaknesses" in the State's case, which they conclude render the evidence closely balanced. If the weaknesses in this case are sufficient to render the evidence closely balanced for purposes of plain error review, then this limited exception to forfeiture will, in fact, be the norm in cases where the State's evidence is anything less than overwhelming. Quite simply, the majority's reliance on *Sebby* invites its application in any case involving a defective Rule 431(b) admonishment in which the trier of fact is required to make credibility assessments, *i.e.*, often.[1]

¶ 123    Our supreme court's analysis in *Piatkowski* likewise does not support the conclusion that Othman has sustained his burden to show that the evidence in this case was closely balanced. In *Piatkowski*, the defendant's conviction for murder depended on the testimony of two eyewitnesses who identified him as the driver of a van who shot at a group of people, killing one of them. *Piatkowski*, 225 Ill. 2d at 558. Both witnesses described the driver as a "male, white/Hispanic" with a goatee. In later photo arrays and lineups, defendant was the only participant with a goatee, an identifying feature that both eyewitnesses said led them to pick out defendant as the shooter. *Id.* at 570. The defendant's jury was erroneously instructed that the factors for evaluating the reliability of eyewitness identifications should be considered in the disjunctive, rather than collectively, *i.e.*, by placing "or" instead of "and" between each factor. *Id.* at 561-62. The erroneous form of the instruction allowed the jury to select one factor as dispositive, and the court found that the factors considered cumulatively did not overwhelmingly favor the State. Given the lack of any other evidence, including inculpatory statements or corroborating evidence, connecting defendant to the crime, the court found that

___

[1]Of course, reviewing courts would have no occasion to apply *Sebby* in cases involving errors in admonishing prospective jurors under Rule 431(b) if trial judges would simply ask jurors, as the rule requires, whether they "understand" and "accept" the four *Zehr* principles.

45

defendant had sustained his burden to show that the error in the jury instruction tipped the scales in a closely balanced case and required a new trial. *Id.* at 568.

¶ 124    Here, the evidence against Othman is demonstrably stronger than the evidence in *Piatkowski* and, as discussed below, includes both inculpatory statements and substantial corroborating evidence. Moreover, the jury instruction error in *Piatkowski* related directly to both the sole evidence presented by the State connecting defendant to the crime and the primary issue the jury was called upon to decide: whether the eyewitnesses' identifications of the defendant as the shooter were reliable. Here, in contrast, the errors identified by the majority did not affect the jury's ability to assess Othman's motive and opportunity to commit the murder, nor did they permit the jury to resolve credibility issues with inadequate or incorrect instructions. Accordingly, the errors identified by the majority did not tip the balance of the substantial evidence presented by the State against Othman so as to require a new trial.

¶ 125    The evidence against Othman, though circumstantial, was substantial and amply corroborated. See *People v. Brown*, 2013 IL 114196, ¶ 49 (citing *People v. Wheeler*, 226 Ill. 2d 92, 120 (2007) (defendant's guilt may be proved by circumstantial evidence alone), and *People v. Hall*, 194 Ill. 2d 305, 330 (2000)). There is no chance that Othman's jury was persuaded to find him guilty because (i) they heard evidence that two years after Said's murder, Othman asked his girlfriend to carry a gun for him in her purse or (ii) they were not adequately admonished regarding the *Zehr* principles. A closer examination of the evidence compels the conclusion that it was not closely balanced at all.

¶ 126    Lloyd's long history of drug abuse, her admitted use of narcotics the day before her trial testimony, and her failure to tell police about (i) the dispute with Othman over Said's use of

46

the cocaine he was supposed to sell and (ii) Othman's possession of a weapon during that confrontation were rightfully subject to vigorous cross-examination by the defense. But Lloyd's obvious vulnerabilities do not render her testimony inherently suspect or, for that reason, the evidence closely balanced. After all, had Lloyd been out to frame Othman (for some unexplained reason), she could easily have told police that she, in fact, witnessed Said's murder.

¶ 127　　　　Further, drug use does not automatically support rejection of a witness's testimony, especially when the testimony is corroborated by other evidence. *People v. Moss*, 205 Ill. 2d 139, 165-66 (2001); *People v. Smith*, 41 Ill. 2d 158, 161 (1968); *People v. Larry*, 30 Ill. 2d 533, 536 (1964); *People v. Ingram*, 91 Ill. App. 3d 1074, 1078 (1980). And Lloyd's testimony was amply corroborated. For example, Fernandez's account of Othman confessing to shooting his uncle (albeit accidentally) corroborated Lloyd's testimony that Othman threatened Said with a gun earlier that day. Likewise, Lloyd's testimony placing Othman at the scene late in the morning of April 29 was corroborated by Alkhatatbeh's testimony that he saw Othman there around mid-day, approximately an hour after Lloyd said Othman showed up at the basement space. And the cocaine metabolites found in Said's system following his death corroborated Lloyd's account regarding her and Said's use of crack cocaine the night before. Although the majority faults Lloyd for not telling police about her own narcotics use, I find it unsurprising that a drug addict would not volunteer evidence of her own criminal behavior to police. And it is likewise unremarkable that Lloyd did not inform police about Othman's possession of a gun the night before the murder as Othman did not threaten Lloyd or Said that evening and Othman's possession of a weapon the night

47

before the murder, while circumstantially relevant to the State's case, did not directly pertain to Said's murder.

¶ 128    The majority finds it impossible to reconcile Alkhatabeh's testimony that he saw Said outside the building at about 7 a.m. with Lloyd's testimony that she tried to wake Said at 10 a.m. and could not and that Said was asleep at 11 a.m. when Othman arrived. Yet, it is entirely conceivable that Said woke up early and went outside to relieve himself (there was no running water or bathroom facilities in the basement space) without waking Lloyd and that he returned, after a night of ingesting cocaine and alcohol, to fall asleep again. The majority also finds reason to doubt Lloyd's testimony based on the absence of articles of her clothing in the basement Said occupied, calling into question the testimony that she lived with Said part-time. But Lloyd also lived with her teenage daughter in the neighborhood and given that Said was basically squatting in the otherwise uninhabitable basement space, the fact that Lloyd's possessions were absent is irrelevant.

¶ 129    The majority faults Lloyd for failing to go to the police after she learned of Said's murder. But we often deal with cases in which witnesses to crimes do not come forward out of fear or because they distrust the police. The majority overlooks the entirely believable reason why Lloyd did not contact the police as she testified to at trial: "If he killed his uncle, what's he going to do to me? *** I live in that neighborhood, and that's just not something you do."

¶ 130    Certainly, Lloyd's testimony was not corroborated in every detail, nor was her account of events entirely consistent over time. But these weaknesses were argued to the jury, and we are not in a position to override the jury's decision to accept testimony that was not

48

inherently unbelievable. See *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004) (the fact finder judges how flaws in part of a witness's testimony affects the credibility of the whole).

¶ 131     Regarding Fernandez, the majority discredits his testimony because (i) he had a brief sexual relationship with Othman's one-time girlfriend and told her she "should not be with" Othman and (ii) he failed to contact police in 2008 when Othman showed up at his house on the day of the murder and confessed to shooting his uncle. But at the time of the murder, Fernandez and Othman had been longtime friends. It is reasonable to infer that this friendship would have dissuaded Fernandez from turning Othman in on the day of the murder, particularly since Othman characterized the shooting as "accidental." And given Fernandez's brief relationship with Herrera (lasting less than a month), a reasonable finder of fact could have rejected, just as the jury did, Othman's assertion that Fernandez made up the story about Othman just to keep Othman in jail. Indeed, had Fernandez's motivation for implicating Othman in the murder been the desire to continue his relationship with Herrera, it would stand to reason that Fernandez would have gone to the police rather than waiting for the police to come to him only by chance[2] during the course of their investigation. And the majority fails to acknowledge the evidence that Othman confessed to both Fernandez and Mansour, two people who had never met and did not know each other, but who the majority concludes separately decided to frame Othman for Said's murder.

¶ 132     The majority reserves its harshest evaluation for Mansour, but of all the State's witnesses, it was Mansour's testimony that was most amply corroborated. The majority correctly points out that Mansour's status as a "jailhouse snitch" raised serious credibility concerns, but a witness's mere expectation of favorable treatment in exchange for testifying does not,

_____

[2]The information Mansour gave to police led them to Herrera. Herrera, in turn, led police to Fernandez.

49

standing alone, destroy credibility. *People v. Manning*, 182 Ill. 2d 193, 210 (1998); see *People v. Belknap*, 2014 IL 117094, ¶ 55 (jailhouse informant's testimony, although viewed with caution, not inherently unbelievable). Any credibility concerns involving Mansour's hope for a reward in exchange for his testimony were mitigated because Mansour was not offered immediate release from a prison sentence. See *People v. Knox*, 241 Ill. App. 3d 205, 208-09, 216 (1993) (jailhouse informants found credible after receiving probation in place of jail time or dropped charges). Instead, rather than posting a cash bond for his release while awaiting trial, Mansour requested release on his own recognizance, which he received. Upon his release, Mansour provided police all of the details of his conversations with Othman. Although Mansour later received additional rewards (plea agreement lowering his charge, monetary assistance after the consensual overhears, and relocation costs for his protection when Othman was to be released from jail on his burglary charge), by that time, Mansour had already told police what he knew about Said's murder. And there were no inconsistencies between the information Mansour gave to police and his trial testimony, creating the reasonable presumption that the additional rewards he received did not affect the truthfulness of that testimony.

¶ 133    I do not understand the majority's comment that Mansour "had plenty of time to *get briefed on a story line* between the time he asked for his deal and the time of the trial." (Emphasis added.) *Supra* ¶ 52. The only persons who could have "briefed" Mansour on a "story line" were the police or prosecutors, and so my colleagues are unavoidably suggesting that one or both of these parties suborned perjury when they "briefed" Mansour to testify about details he did not otherwise know. Not only is there no support in the record for such a serious accusation of police/prosecutorial misconduct, but, at bottom, it makes absolutely no

50

sense. The only evidence in the record is that Mansour gave police the details of Said's murder that he had learned from Othman before he received any concessions from the prosecution and before he received funds to relocate for his protection. As to other "story lines" the majority speculates Mansour could have been "briefed" on, before police knew anything about her, Mansour told police about Othman's girlfriend Herrera and that Othman told him about Herrera carrying a gun for him in her purse, information the police were able to confirm with Herrera. Thus, Mansour led police to Herrera, and not vice versa. Similarly, Mansour told police police about Othman's cousin Rasheed being in jail for a shooting committed on his birthday, details the police did not know until Mansour told them, but were later able to confirm. The majority's suggestion that Mansour was fed a "story line" is unfounded and unwarranted.

¶ 134     Importantly, the information Mansour provided at trial was corroborated in several respects by Othman's own words. Mansour and Othman became friends while both were in jail. The fact and the closeness of the relationship is confirmed in a letter Othman wrote to Mansour after Mansour visited him in jail. In the letter admitted into evidence at trial, which the majority does not mention, Othman referred to Mansour as "friend," thanked him for coming to visit ("I like it when you visit"), and expressed regret that he had not been able to freely converse with Mansour during the visit ("I feel like last time you came I didn't have a chance to talk to you like I wanted to. Inshallah[3] next time I see you we'll talk and get some things cleared up."). Thus, Othman himself provided strong circumstantial evidence of the trustworthiness of Mansour's claim that Othman took him into his confidence.

---

[3]According to the Merriam-Webster's Online Dictionary, "Inshallah" is Arabic for "God willing." Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/inshallah (last visited Feb. 20, 2019) [https://perma.cc/2J6L-WUG2].

¶ 135    The reliability of Mansour's testimony, which, again, the jury was entitled to and did accept, is demonstrated by a litany of other evidence presented at trial. The notion that Othman would confess to his friend Mansour was corroborated by Othman's prompt confession to his longtime friend Fernandez on the day of the murder, when Othman, "acting paranoid," arrived at Fernandez's home and asked to stay the night. It is beside the point that Othman attempted to downplay the violence to Fernandez by claiming that Said was shot when the two struggled over a gun (a story he might tell the police if he was caught in 2008), while he admitted to Mansour (two years later, at a time when he believed he had literally "gotten away with murder") that he deliberately shot the victim three times, twice in the forehead and once in the eye. Othman also shared with Mansour where the murder occurred ("Crown Town"), the caliber of the weapon he used (.25 caliber), and the number and location of the shots to the victim's head (two to the forehead and one to the eye), all of which were confirmed by the evidence at trial. Mansour could only have obtained this information from Othman.

¶ 136    Likewise, Othman told Mansour that he threw away his jacket after the murder, a fact the jury could infer was corroborated by Alkhatatbeh's sighting of Othman, who "*wasn't natural*," on the back stairs that day, carrying a black garbage bag. (Emphasis added.)The majority also claims that Mansour's testimony that Othman told him he stole the victim's wallet, which contained $50, conflicts with Lloyd's testimony that on the morning of the murder Said had to borrow money from neighbors to pay for the cocaine. But it is irrelevant whether Said, in fact, had money in his wallet, given that Othman told Mansour he stole his victim's wallet and no wallet was found on or near Said's body. The record also shows that the pockets of Said's pants were turned inside out, supporting the inference that the murderer

52

intended police to believe that robbery was the motive. As if this wasn't enough, the State provided corroboration for details, discussed above, of Mansour's testimony unrelated to the murder. Mansour could not have known the information he gave police about Othman's girlfriend Herrera and Othman's cousin Rasheed unless Othman told him.

¶ 137        All of this corroborating evidence bolsters the believability of Mansour's account of Othman's confession. Given the abundant corroboration of Mansour's knowledge of the circumstances of Said's murder, together with the unlikely coincidence that *both* Mansour and Fernandez independently decided to frame Othman by claiming he confessed to them on two different occasions, the jury properly afforded Mansour's testimony the weight it deserved.

¶ 138        The majority also concludes, apparently independently, that the admission of the portion of Herrera's testimony referring to holding a gun for Othman in 2010 entitles him to a new trial (*supra* ¶ 44). I agree that Herrera should not have been permitted to testify about Othman's request that she carry a gun for him two years after the murder. Although this aspect of Herrera's testimony provided additional corroboration for Mansour's testimony and so was relevant, evidence about Othman's possession of a gun (not the murder weapon) two years after the murder was improper because it constituted other crimes evidence, which is not admissible to bolster a witness's testimony. See *People v. Jackson*, 154 Ill. App. 3d 241, 246 (1987) (evidence of defendant's possession of a weapon unrelated to the offense is generally improper). But while this testimony should not have been admitted, this error does not warrant a new trial. It could have come as no revelation to Othman's jury that he was in possession of a weapon in 2010 given his confessions to the shooting in 2008 coupled with Lloyd's testimony about the gun she saw him with the day before and the day of the murder.

53

There is no reasonable likelihood that Othman's jury convicted him because he gave Herrera a gun to hold in her purse two years after the murder. So, Othman suffered no prejudice as a result of the error, and it was harmless beyond a reasonable doubt. See *People v. Padgett*, 248 Ill. App. 3d 1018, 1025 (1993); *People v. Rickard*, 99 Ill. App. 3d 914, 918 (1981) (admission of an unrelated weapon was harmless error given the overwhelming evidence of the defendant's guilt). And the trial court instructed the jury that it could not consider this testimony as proof that Othman did, in fact, possess the weapon in 2010. In light of my belief that the evidence in this case was not closely balanced, even arguably so, this error, whether considered in isolation or in conjunction with the Rule 431(b) error, is not grounds for a new trial. *Nolan v. Weil-McLain*, 233 Ill. 2d 416, 464 (2009); *People v. Bull*, 185 Ill. 2d 179, 214-15 (1998); *People v. Kraybill*, 2014 IL App (1st) 120232, ¶ 70 (a defendant is entitled to a fair trial, but not a perfect one).

¶ 139　　Unlike *Sebby*, we are not faced with competing versions of events surrounding Said's murder, both uncorroborated by extrinsic evidence and one of which, if believed by the fact finder, would necessarily lead to Othman's acquittal. There are no reasonable inferences to be drawn from the evidence pointing to someone other than Othman as Said's murderer; rather, the jury correctly decided (after less than two hours of deliberation), that the State had sustained its burden to prove Othman's guilt beyond a reasonable doubt. See *People v. Reeves*, 314 Ill. App. 3d 482, 489 (2000) (" '[c]losely balanced' assumes the presence of some evidence from which contrary inferences can be drawn"). And unlike *Piatkowski*, the erroneous admission of Herrera's testimony that she carried a gun for Othman in 2010 did not make it more likely that Othman murdered his uncle two years earlier in 2008. So this evidentiary error could not have persuaded to jury to convict Othman.

54

¶ 140    The State established both the motive and opportunity for Othman to murder Said. Othman's jury knew that Lloyd was a drug addict, that Mansour traded information he provided to police about the murder for favorable treatment, and that Fernandez had a romantic relationship with Herrera while Othman was incarcerated. The only "contrary inference" the jury could have drawn was that these witnesses were not believable, but the jury clearly decided otherwise. The majority is only second-guessing that determination when it finds the evidence closely balanced.

¶ 141    Finally, I take issue with the majority's finding that Othman's counsel's performance was deficient for failing to object to Lloyd's hearsay testimony that unidentified "friends in the neighborhood" told her that Othman shot Said. I disagree with my colleagues that Othman can satisfy either prong of the *Strickland* test: his lawyer's performance was not deficient and he was not prejudiced. *Strickland*, 466 U.S. at 692 (1984); *People v. Patterson*, 2014 IL 115102, ¶ 81.

¶ 142    It is well settled that a defendant is entitled to a fair trial, not a perfect one, and that defendant is entitled to competent counsel, not perfect representation. *People v. Easley*, 192 Ill. 2d 307, 344 (2000).

> "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689.

See *People v. Jordan*, 247 Ill. App. 3d 75, 82 (1993) ("A reviewing court must keep ever present the recognition that it is to give great deference to the performance of counsel and

55

resist the temptation to second-guess a particular decision or omission."). Only the most egregious of tactical or strategic mistakes can serve as the basis for finding a violation of a defendant's right to effective trial counsel, such as when counsel's chosen trial strategy results in the failure to conduct any meaningful adversarial testing of the prosecution's case. *People v. Reid*, 179 Ill. 2d 297, 310 (1997).

¶ 143    Claims of ineffective assistance premised on strategic decisions made by trial counsel must be fairly assessed making every effort "to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689; see *Fuller*, 205 Ill. 2d at 331 (issues of trial strategy must be viewed, not in hindsight, but from the time of counsel's conduct and with great deference afforded counsel's decisions).

> "[N]either mistakes in strategy nor the fact that another attorney with the benefit of hindsight would have handled the case differently indicates the trial lawyer was incompetent. (*People v. Edwards* (1991), 218 Ill. App. 3d 184, 198, 577 N.E.2d 1250). The defendant must overcome a 'strong presumption that counsel's complained-of action or inaction was merely trial strategy.' *People v. Medrano* (1995), 271 Ill. App. 3d 97, 100, 648 N.E.2d 218, 221." *People v. Vera*, 277 Ill. App. 3d 130, 138 (1995).

¶ 144    Regarding the first *Strickland* prong, there is nothing in the record demonstrating that counsel's performance was deficient. Under the facts of this case, counsel's failure to object to a single question and answer can hardly give rise to a claim of ineffective assistance. Lloyd's testimony regarding what "others in the neighborhood" told her about Said's murder did not tell the jury anything they didn't already know. The jury heard evidence placing Othman at the scene shortly before and shortly after the murder. The jury also knew that

56

police considered Othman a suspect after they spoke to Lloyd and before the case went cold. And given Lloyd's obvious credibility issues, which defense counsel vigorously attacked, he could also have reasonably decided as a matter of strategy not to highlight what she heard from "others in the neighborhood" by objecting to it.

¶ 145    Othman's privately retained counsel vigorously and competently advocated on his behalf and no reasonable argument can be made that he rendered ineffective assistance. Counsel challenged the credibility of the State's witnesses, unsuccessfully sought to prevent the State from introducing Herrera's testimony regarding holding the gun for Othman, and forcefully argued that the State had not satisfied its burden to prove Othman guilty beyond a reasonable doubt. Indeed, in sentencing Othman, the court commented, "Your attorneys have gone above and beyond with cross-examination of every single witness. They never let up. They fought it the entire way." There is no basis for concluding that Othman's counsel failed to conduct meaningful adversarial testing of the State's case. *Reid*, 179 Ill. 2d at 310.

¶ 146    Likewise, I find that Othman cannot satisfy the prejudice prong of the *Strickland* test based on counsel's failure to object to this brief exchange during Lloyd's testimony. The majority posits that admission of Lloyd's testimony was prejudicial because the jury could draw the inference that there were other nontestifying witnesses who could confirm that Othman shot and killed Said. But it is improbable, at best, to surmise that Lloyd's single hearsay answer affected the outcome of Othman's trial. The jury knew that Lloyd was present on the day of the murder when Othman and Said argued and when Othman threatened them both with a gun. The jury also heard evidence that Said's body was discovered a short time later in the alley by the apartment building and that the cause of death was gunshot wounds. With this evidence, the jury did not need Lloyd's testimony regarding

57

what "friends in the neighborhood" later told her to connect Othman to Said's murder. Coupled with counsel's vigorous attacks on Lloyd's credibility, it is pure speculation that this single answer affected the outcome of the trial, particularly given that it was never mentioned again either during the presentation of evidence or during closing arguments. Consequently, assuming counsel should have objected to Lloyd's testimony on this point, the failure to do so did not prejudice to Othman.

¶ 147    I agree that the final claim of trial error concerning closing argument was not preserved for our review and so I do not separately address it.

¶ 148    I address briefly two issues the majority raises *sua sponte*. First, the majority points to Biggs's testimony at trial that she heard the "pops" around 10:30 a.m. and her statement to police near the time of the murder that she heard them around noon. In its statement of facts, the majority represents that, during closing arguments, the prosecution "improperly invited the jury to treat its impeachment of Biggs as substantive evidence that the shooting took place at noon" (*supra* ¶ 28). This is simply untrue. Apart from the fact that the prosecution properly argued that the jury could rely on Biggs's recollection in her statement to police, rather than her recollection years later at trial, Othman raised no error on this point either in the trial court or here. The majority's gratuitous finding of error where none is asserted is improper. See *People v. Givens*, 237 Ill. 2d 311, 323 (2010) (apart from assessing for subject matter jurisdiction, it is improper for a reviewing court to "search the record for unargued and unbriefed reasons to *reverse* a trial court judgment," transforming its role from jurist to advocate (emphasis in original and internal quotation marks omitted)). Likewise, with regard to the erroneous admission of Herrera's testimony, the majority does not limit its discussion to the evidentiary error raised by Othman, but separately raises and deems meritorious an

58

argument that IPI Criminal 4th No. 3.14 that told the jury to consider that evidence only for the limited purpose for which it was admitted must have been confusing. The trial court *did* admit Herrera's testimony for a limited purpose, albeit improperly, so it did not err in reminding the jury that it could only be considered for that purpose. And again, because this evidence was, at best, tangentially related to the murder and because the jury expressed no "confusion" during its brief deliberations, the majority's extended discussion of this issue is improper.

¶ 149    Because the majority is remanding the case for a new trial and Othman will be sentenced only if he is again convicted, I do not understand the majority's decision to address *in dicta* Othman's challenges to his 55-year sentence. It is not our role as a court of review to render advisory opinions and, in particular, to address sentencing issues that may or may not arise on remand. *People v. Harvey*, 2018 IL 122325, ¶ 19; *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2016 IL 118129, ¶ 10; *Golden Rule Insurance Co. v. Schwartz*, 203 Ill. 2d 456, 469 (2003); *People v. Heritsch*, 2012 IL App (2d) 090719, ¶ 12; *People v. Burnett*, 267 Ill. App. 3d 11, 17-18 (1994) (reviewing courts are not permitted to render advisory opinions). This is particularly true here because if Othman is again convicted, he will be able to take advantage of new legislative enactments designed to address sentencing issues in cases involving juveniles tried as adults. See 730 ILCS 5/5-4.5-105(b) (West 2016) (imposition of the 25-year firearm enhancement for juvenile offenders is discretionary); *id.* § 5-4.5-105(a) (a trial judge must consider nine statutory mitigating factors related to the juvenile's youth before imposing a sentence longer than the minimum sentence); *id*. § 5-4.5-105(c) (imposing a minimum sentence of 40 years instead of natural life for specified types of aggravated murder, such as killing a police officer). All of these enactments will

significantly alter the nature of any sentencing hearing on remand. The majority's extended discussion of juvenile sentencing concerns is unnecessary to the resolution of this appeal.

¶ 150　　　More puzzling is the majority's decision to raise another sentencing issue *sua sponte* and resolve it by declaring the Truth In Sentencing Act unconstitutional as applied to Othman and "similarly situated juvenile offenders tried as adults" (*supra* ¶ 91). Although Othman challenged his term of years sentence as a *de facto* life sentence, Othman did not raise in the trial court and has not raised here any claim that the Truth In Sentencing Act itself is unconstitutional as applied to juveniles. Our supreme court has repeatedly admonished lower courts against reaching constitutional issues unnecessarily. *Gonzalez v. Union Health Services, Inc.*, 2018 IL 123025, ¶ 19; *The Carle Foundation v. Cunningham Township*, 2017 IL 120427, ¶ 34; *People v. Jackson*, 2013 IL 113986, ¶ 14; *In re E.H.*, 224 Ill. 2d 172, 179 (2006); see *People v. Chairez*, 2018 IL 121417, ¶ 13 (courts are prohibited from ruling on the constitutionality of a statute that is not before it). And our supreme court has also made it clear that a reviewing court should refrain from addressing an as-applied constitutional challenge when there has been no evidentiary hearing and no findings of fact made in the trial court. *People v Harris*, 2018 IL 121932, ¶ 41; *People ex rel. Hartrich v. 2010 Harley-Davidson*, 2018 IL 121636, ¶¶ 31, 32; *In re Parentage of John M.*, 212 Ill. 2d 253, 268 (2004); see *People v. Thompson*, 2015 IL 118151, ¶¶ 37, 39 (defendant must raise an as-applied challenge to the constitutionality of a statute in the trial court to develop the record sufficiently). Because the majority reaches constitutional issues that have not been raised by the parties and are plainly not necessary to the resolution of this appeal, I refrain from commenting on the analysis.

¶ 151    As a final matter, although this court is vested with the authority on remand to direct reassignment of the matter to a new judge, doing so is unwarranted here. Most importantly, Othman has not requested that relief and has not suggested that the trial court's conduct of the trial evidenced bias against him. The majority *sua sponte* concludes that remand for retrial before another judge is required based on a comment made during Othman's sentencing in which the trial judge observed that Othman's character was " 'already set in stone' " at the time he decided to leave the gang he joined at age 16 (*supra* ¶ 31). From this, the majority reasons that the judge on remand would refuse to consider Othman's youth and its associated characteristics in sentencing him should he again be convicted. However, sufficient safeguards exist to ensure that the trial court would consider all appropriate factors, in light of the development of case law protecting juvenile defendants since Othman's original sentencing hearing (see *Holman*, 2017 IL 120655, ¶ 46 (discretionary life sentence may be imposed on a juvenile only if the trial court determines that "the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation"); *People v. Reyes*, 2016 IL 119271, ¶ 9 (court may not sentence a juvenile convicted of homicide to a mandatory term-of-years sentence that amounts to a *de facto* life sentence without first considering the *Miller* factors)) and in light of the recent legislative enactments referred to above. We do trial judges a disservice when we assume in advance that they will not follow the law.

¶ 152    I would affirm Othman's convictions.