2023 IL App (1st) 190948-U

SECOND DIVISION
June 6, 2023

No. 1-19-0948

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 10748 (01) |
| | ) | |
| ANTHONY BRADLEY, | ) | Honorable |
| | ) | Maura Slattery-Boyle, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Justices Ellis and Cobbs concurred in the judgment.

ORDER

¶ 1   *Held*:   The judgment of the circuit court of Cook County convicting defendant of first degree murder is reversed and the cause is remanded for a new trial; the trial court failed to comply with Illinois Supreme Court Rule 431(b); because the evidence is closely balanced we are required to reverse and remand this case for a new trial.

¶ 2   The State charged defendant, Anthony Bradley, with first degree murder for the shooting death of Kenneth Barbour. The matter proceeded to a trial before a jury. Two eyewitnesses to the shooting identified defendant and testified at trial, and a police detective also testified at trial as to the eyewitnesses' identifications, without objection. Defendant's attorney also elicited evidence of a possible motive for the killing and failed to call an expert witness in the field of eyewitness identification. The jury found defendant guilty and the trial court sentenced defendant to 55 years' imprisonment.

¶ 3    For the following reasons, we reverse defendant's conviction and remand for a new trial.

¶ 4                                    BACKGROUND

¶ 5    In August 2013, Jade Graham, then 16-years-old, got into a fistfight with her former friend Ashante Gills, a/k/a Misty, on the street in Chicago in the area of 67th Street and Champlain. Jade testified that on the day of the fight she lived in the area of 67th and Rhodes and Misty lived in the area of 65th and Rhodes. After the fight, Jade went home walking westbound and Misty went in the opposite direction, walking eastbound. Jade testified that as Misty left the area, Misty said that she was going to get her brother, the defendant in this case. Jade went home but then went back out to the area of 68th and St. Lawrence, where a number of people were gathered. Jade testified that when she arrived she saw Barbour and defendant. Jade identified defendant in court as the person she saw at 68th and St. Lawrence with Barbour. Misty was also present at that time and standing with defendant. Jade learned later that defendant is Misty's brother. Jade testified that she saw that defendant had a gun out, saw Barbour "smack" the gun with his hand, and saw defendant shoot Barbour. After defendant shot Barbour, defendant and Misty got into separate vehicles and drove away.

¶ 6    Jade testified she saw Barbour and Jocelyn at the scene. Jade testified that immediately after the shooting, after the cars pulled off, she "ran across the street" toward where Barbour was shot. Jocelyn was with Barbour. Jade testified that two days after the shooting detectives showed Jade a photo array. Jade testified that she recognized defendant's photo in the array and that defendant was the person who shot Barbour. On May 20, 2014, Jade viewed a physical lineup. At trial, Jade identified defendant in a photo of the lineup she viewed on May 20, 2014. Jade testified that defendant, the person she identified in the photo of the lineup, was the person who shot Barbour.

¶ 7    At trial, on cross-examination defendant's attorney asked Jade about detectives' questioning of her about the fight between Jade and Misty. During that examination, defendant's attorney asked Jade the following questions, and received the following answers:

"Q. [Misty] walked away on her own, right?

A. Yes.

Q. You didn't knock her out?

A. No.

Q. This fight happens and then you tell them [(the police)] about that and did Misty, do you recall Misty saying anything at that point?

A. Repeat that.

Q. Did Misty say anything after the fight, like peace?

A. She was going to get her brother.

Q. Do you know how many brothers Misty has?

A. At that point I knew about one.

Q. You only knew about one brother, correct?

A. Yes.

Q. My question to you was do you know how many she had?

A. No.

Q. The word brother, right, can have many meanings, is that true?

A. Yes.

Q. One meaning can be someone who is a close friend, that's my brother, yes?

A. Yes.

¶ 8    On cross-examination, Jade admitted she did not go to the police after the shooting. When police did speak to Jade, Jade did not initially tell police defendant was the shooter; Jade learned the shooter's identity through questioning by police:

> "A. They had, they asked me questions. Then when they came with the pictures, I pointed out or whatever, then that's when it came out. I didn't just say [defendant] did it, no. It didn't go like that. That was after all the questions was asked and then the pictures was set down. Then the name came about."

Jade did not know defendant before police came to her house to interview her. At the time of the shooting Jade could only view the side of the shooter's face, in profile, because of where they were standing relative to each other. Defense counsel elicited testimony that Jade could not remember what the shooter was wearing, how the shooter's hair was cut, or whether the shooter had any facial hair. Jade also admitted to looking at the gun rather than the person holding it.

¶ 9    Jade testified the shooter and Barbour were about the same height or the shooter was only slightly shorter. On cross-examination Jade testified that the two cars that arrived at the scene came from the same direction, one behind the other. Jade then testified on redirect that the two cars were already present when she arrived.

¶ 10    Later in the defense cross-examination of Jade, defendant's attorney asked Jade whether Jade had ever been shown a cell phone on the day of the shooting. Jade testified that she did not recall a cell phone being shown to her, or a cell-phone photograph of a person she later identified as the shooter being shown to her. Jade denied that anyone showed her a photograph of the person she alleges was the shooter. Jade did not recall talking to an attorney about this case and indicating to them that someone had shown her a picture of the alleged shooter on a cell phone.

¶ 11     Jocelyn Solomon was 17-years old at the time of the shooting and Jocelyn knew the victim. On the night of the shooting Jocelyn saw two cars pull up from opposite directions to 68th Street and St. Lawrence. Jocelyn saw two males exit one vehicle and two females exit the second vehicle. One of the males had a gun. The male with the gun and Barbour struggled over the gun and the male who arrived with the gun shot Barbour. Jocelyn identified defendant in court as the male who had the gun.

¶ 12     Jocelyn met Chicago Police Department Detective Jones on August 14, 2013 at the police station. On that day, Jocelyn viewed a photo array. Jocelyn identified a photo of defendant as the person Jocelyn saw shoot Barbour. (Specifically, Jocelyn identified the photo number of that person in the photo array.) On May 21, 2014, Jocelyn viewed a physical lineup associated with this case. At defendant's trial Jocelyn viewed a photograph of the lineup she viewed on May 21, 2014. Jocelyn testified that she identified the "man in the middle as the shooter," who was defendant.

¶ 13     Jocelyn did not initiate contact with police; they came to her. Jocelyn testified that after she arrived at the scene she, Barbour, and Jocelyn's friend started walking. Then, Jocelyn testified, two cars pulled up. Jocelyn testified that "two guys got out of one car" and "two females got out of the other car." On cross-examination, Jocelyn testified that she did not see Jade at the scene of the shooting until after an ambulance arrived. Jocelyn also testified that she never told police before the trial that two girls exited one of the two cars that approached the intersection prior to the shooting. Jocelyn could not describe the shooter's height beyond saying the shooter was shorter than the victim. Jocelyn had never seen the shooter before. Jocelyn stated on cross-examination that she could not recall whether the shooter had any facial hair, what the shooter's hair looked like, or what the shooter was wearing. Also, Jocelyn could not recall which

hand the shooter held the gun in. Jocelyn testified that when she saw the shooter with a gun, Jocelyn was looking at the gun. Defense counsel elicited testimony that Jocelyn only saw the shooter "for a matter of seconds."

¶ 14     Prior to trial, the State filed a motion *in limine* to admit evidence of information contained in a "contact card" by the Chicago Police Department documenting an encounter with defendant in which defendant gave his home address. The State's motion argued this evidence was probative of defendant's identity, where defendant purported to share an address with his sister, and the shooting resulted from an altercation between defendant's sister and the victim's friend. The trial court granted the State's motion finding that the contact card is a "business record" kept by the Chicago Police Department and that the evidence was probative of how police linked defendant to the offense. In its oral ruling on the motion, the trial court stated that the assistant state's attorney "indicates that she's not getting into the statement [by defendant's sister after the fight] in regards to I'm going to get my brother ***."

¶ 15     Officer Bruno testified that on June 19, 2013, he was working as a police officer and encountered defendant. The State asked Officer Bruno whether, during his conversation with defendant, defendant indicated that he lived in the vicinity of 65th Street and Rhodes in Chicago. Bruno testified that defendant did so indicate. The purpose of a contact card is to document an officer's interaction with an individual. Officer Bruno testified he completed a contact card for his interaction with defendant. Officer Bruno admitted he would not be able to recognize defendant.

¶ 16     Officer Bruno testified that the contact card for Officer Bruno's interaction with defendant states that the officer was not able to verify the name of the individual because the individual did not have identification. Defense counsel asked Officer Bruno whether he knew if

the person he had contact with was in fact defendant, and Officer Bruno testified that he did not recall defendant. Officer Bruno testified that other officers on the scene would have checked police databases for warrants for the individual involved in the contact. Police can access photographs of people who have been previously arrested with a name and date of birth. Officer Bruno testified police would not allow the individual to leave until police verified the name the individual gave them. Officer Bruno admitted he cannot verify where an individual lives without going to the location and he otherwise has no way to verify an address an individual gives him.

¶ 17    Detective Jones of the Chicago Police Department testified that he met with Jade on August 11, 2013 and showed Jade a photo array. Detective Jones did not testify that Jade identified anyone when Detective Jones showed Jade the photo array. Detective Jones testified that after he showed Jade the photo array, he issued an "investigative alert" for defendant. (An investigative alert is a means by which the Chicago Police alert members of the department that detectives wish to interview an individual.)

¶ 18    Detective Jones testified that he met with Jocelyn Solomon that same day (August 11). Detective Jones had learned that Jocelyn was a witness to the shooting. Detective Jones testified that Jocelyn identified a photograph of defendant from the photo array as the person who shot and killed Barbour on August 9, 2013. The detective identified defendant in court as the person in the photograph. Detective Jones also testified that on August 14, at the police station, Jocelyn identified defendant from a separate photo array as the person who shot and killed Barbour.

¶ 19    On May 20, 2014, Detective Jones learned that defendant was in custody. As a result, Detective Jones wanted Jade and Jocelyn to view a physical lineup. Detective Jones testified that Jade viewed a physical lineup in the evening of May 20, 2014, and Jade identified defendant as the person who shot and killed Barbour on August 9, 2013. Detective Jones testified that Jocelyn

viewed a physical lineup the next day, May 21, 2014, and that Jocelyn identified defendant as the shooter who killed Barbour.

¶ 20    The parties entered a stipulation that on November 29, 2017, Jade met with an assistant state's attorney and during that meeting, Jade told the ASA that people had gathered to talk and what happened shortly after the shooting. During that time someone showed Jade a picture of defendant on a cell phone. When Jade saw defendant's picture on the cell phone Jade recognized defendant as the shooter.

¶ 21    The jury found defendant guilty of first degree murder. The trial court sentenced defendant to a 55-year term of imprisonment.

¶ 22    This appeal followed.

¶ 23                                    ANALYSIS

¶ 24    Defendant first argues the trial court denied defendant the right to a fair and impartial trial when the court failed to ensure that potential jurors understood and accepted the principle that a defendant's failure to testify cannot be held against them and that the potential jurors would abide by that principle. Defendant admits his trial counsel failed to preserve this issue for review but asks this court to review the matter for plain error under the first prong of plain error review. The State agrees the trial court erred when it "failed to ensure that prospective jurors understood and accepted that defendant's decision not to testify could not be held against him." Nonetheless, the State responds first-prong plain error review is not warranted in this case; therefore, defendant forfeit this claim for review.

¶ 25    Whether the trial court complied with its obligations under Rule 431(b) is a question of law we review *de novo*. *People v. Joseph*, 2021 IL App (1st) 170741, ¶ 20 (citing *People v. Belknap*, 2014 IL 117094, ¶ 41). Whether a claimed error is subject to review under the first

prong of the plain error rule is also a question we review *de novo*. *People v. Mudd*, 2022 IL 126830, ¶ 22; *People v. Lozano*, 2022 IL App (1st) 182170, ¶ 58. We find that the trial court erred in failing to ask potential jurors whether they understand and accepted the principle that a defendant's choice not to testify cannot be held against them. We also find that this error is subject to review under the first prong of the plain error rule.

¶ 26      Our supreme court codified its decision in *People v. Zehr*, 103 Ill. 2d 472 (1984), in Illinois Supreme Court Rule 431(b) (eff. Jul. 1, 2012). *People v. Birge*, 2021 IL 125644, ¶ 31. Rule 431(b) reads, in pertinent part, as follows:

> "(b) The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects." IL S. Ct. R. 431(b).

¶ 27      The trial court erred when it failed to question potential jurors on whether they understood and accepted the fourth *Zehr* principle, that defendant's decision not to testify could not be held against defendant. *People v. Magallanes*, 409 Ill. App. 3d 720, 730 (2011) ("error clearly occurred here because the trial court did not question each venireperson as to whether he or she understood and accepted the fourth *Zehr* principle"). See also *id*. at 736 (citing *People v. Glasper*, 234 Ill. 2d 173, 197 (2009)).

¶ 28    Defendant failed to preserve this issue for review by not objecting at trial and including it in a posttrial motion. *People v. Jackson*, 2022 IL 127256, ¶ 15 ("We have long held that, for a criminal defendant to preserve an issue for review on appeal, the defendant must object at trial and raise the issue in a written posttrial motion."). Therefore, we must assess the claimed error for plain error review.

>    "The conviction of an innocent person due to an error during the pretrial or trial proceedings would be a miscarriage of justice; therefore, a reviewing court may consider the forfeited error under the first prong of the plain error rule when the evidence is closely balanced. *Id.* In other words, errors reviewable under the first prong of the plain error rule are the type of errors that are subject to harmless error analysis, and a defendant must establish prejudice resulting from the error to excuse his forfeiture of such an error. [Citation.]
>
>    In contrast, under the second prong of the plain error rule, the reviewing courts are not concerned with "prejudicial" error. [Citation.] Instead, the concern under the second prong of the plain error rule is addressing unpreserved errors that undermine the integrity and reputation of the judicial process regardless of the strength of the evidence or the effect of the error on the trial outcome."
>    *Jackson*, 2022 IL 127256, ¶¶ 23-24.

¶ 29    The first step in applying the plain error rule is to determine whether a clear or obvious error occurred, which we have done.

¶ 30    Our supreme court has held that a trial court's failure to comply with Rule 431(b) is not a "structural error" that undermines the integrity and reputation of the judicial process. *People v.*

*Birge*, 2021 IL 125644, ¶ 24 ("a violation of Rule 431(b) is not a second-prong, structural error that requires automatic reversal under a plain-error analysis" (and cases cited therein)).

> "[A] defendant with an unpreserved Rule 431(b) claim must demonstrate first-prong plain error—that is, that the trial evidence was closely balanced. [Citation.] Whether the evidence was closely balanced is not a sufficiency analysis but 'a qualitative, commonsense assessment of the totality of the evidence within the context of the case,' including evidence of witness credibility. [Citation.]" *People v. Rodriguez*, 2022 IL App (1st) 200315, ¶ 134.

¶ 31     Generally, "[w]here judgment rests solely on the credibility of witnesses at trial, the evidence is closely balanced." *People v. Jackson*, 2012 IL App (1st) 102035, ¶ 17 (citing *People v. Steidl,* 177 Ill. 2d 239, 256 (1997)). Our supreme court has addressed situations in which the question was whether the evidence was closely balanced when the defendant does not present any evidence and found that it can be. In *People v. Piatkowski*, 225 Ill. 2d 551, 567 (2007), the defendant presented no alibi and no evidence whatsoever, other than calling the detective who interviewed the witnesses to testify (and, from the court's recitation of the facts who was called to highlight inconsistencies in those witness's statements (see *Piatkowski*, 225 Ill. 2d at 560-61)). The *Piatkowski* court held that the fact the defendant presented no alibi and no evidence was not fatal to the question of whether the evidence was nevertheless closely balanced. *Piatkowski*, 225 Ill. 2d at 567. See also *People v. Othman*, 2019 IL App (1st) 150823, ¶¶ 67-68 (citing *Piatkowski*, 225 Ill. 2d at 567) (expressly rejecting dissenting view that the case was not closely balanced because the defendant presented no evidence).

¶ 32     As our supreme court later explained in *People v. Sebby*, 2017 IL 119445, ¶ 53, "[i]n determining whether the evidence adduced at trial was close, a reviewing court must evaluate the

totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case. [Citations.]" *Sebby*, 2017 IL 119445, ¶ 53. In that case, where the trial court failed to ask potential jurors whether they understood and accepted *any* of the *Zehr* principles (see *Sebby*, 2017 IL 119445, ¶ 49), our supreme court examined the evidence as to each element of the offense to determine whether the evidence was closely balanced. *Id*. ¶¶ 54-59.

¶ 33    In *Sebby*, the defendant did present evidence. See *id*. ¶¶ 54-59. Nonetheless, our supreme court refused to rely on the defendant's argument that the evidence was closely balanced "because both parties presented plausible versions of events." *Id*. ¶ 60. The *Sebby* court stated clearly that the issue was not "the sufficiency of close evidence but rather the closeness of sufficient evidence." *Id*. (citing *Piatkowski*, 225 Ill. 2d at 566). Instead, the *Sebby* court relied on the fact that "[a]s in [*People v.*] *Naylor*, [229 Ill. 2d 584, 606-07 (2008),] the outcome of this case turned on how the finder of fact resolved a "contest of credibility. [Citation.]" *Sebby*, 2017 IL 119445, ¶ 63.

¶ 34    Notably, the *Sebby* opinion does not state or imply that its holding is necessarily dependent upon the defendant's presentation of a credible competing version of events. In refuting the dissent's arguments, the majority in *Sebby* noted that the question was whether a Rule 431(b) violation is reversible error under the first prong of the plain error analysis "where the defendant demonstrates that the trial evidence was close." *Id*. ¶ 78. The answer to that question involved "the quantum of evidence presented by the State against the defendant." (Internal quotation marks omitted.) *Id*. ¶ 78 (quoting *People v. Herron*, 215 Ill. 2d 167, 193 (2005)).

¶ 35    In *Piatkowski*, on which *Sebby* relied for its rule as to what constitutes "closely balanced" evidence (see *id*. ¶ 60), the defendant "presented no alibi and no evidence whatsoever" other than

the testimony of a police detective who interviewed the State's witnesses. *Piatkowski*, 225 Ill. 2d at 567. The *Piatkowski* court also noted that the State "presented no physical evidence to connect [the] defendant to the shooting, and no inculpatory statements by [the] defendant were admitted." *Id*. The quantum of evidence in *Piatkowski* largely mirrors the quantum of evidence in this case. In this case, the State presented only the testimony of two alleged witnesses to the shooting, despite the undisputed presence of a large number of people; and the State adduced no physical evidence linking defendant to the shooting and defendant did not make any inculpatory statements.

¶ 36     In *Piatkowski*, the alleged error "related to how the jury would assess the reliability of [the State's] eyewitness testimony." *Id*. The *Piatkowski* court held that it must "consider whether the evidence presented on the reliability of the eyewitness testimony rendered this case one that is closely balanced." *Id*. The *Piatkowski* court reviewed the evidence as to each *Biggers* factor to assess the reliability of the identification testimony. *Id*. at 567. The *Piatkowski* court found that after "carefully examining [the] defendant's argument in relation to the facts in the record, \*\*\* the evidence presented on these five factors did not overwhelming [*sic*] favor the State, and we believe that [the] defendant has met his burden to show that the evidence was sufficiently closely balanced so as to require a remand for a new trial." *Piatkowski*, 225 Ill. 2d at 568.

¶ 37     Again notably, the *Piatkowski* court did not hold that it had to consider whether the defendant presented a credible version of events. See *id*. at 567. The court based its decision on the fact the "case turned on the credibility of the witnesses' identification testimony and the erroneous instruction involved how the jury would weigh and evaluate such identification testimony. See *id*. at 567-68.

¶ 38    This case also turns on the credibility of the witnesses. Here, the error involves the credibility of the witnesses weighed against the absence of contrary testimony by the defendant and how the jury would consider that circumstance. Under the foregoing authority, we look to "the quantum of evidence presented by the State against the defendant" (*Sebby*, 2017 IL 119445, ¶ 78) in the context of how the alleged error impacts the jury's assessment of that evidence or the case (*Piatkowski*, 225 Ill. 2d at 567) by conducting "a qualitative, commonsense assessment of [the evidence] (*Sebby*, 2017 IL 119445, ¶ 53). Thus, in this case, we must consider whether the evidence presented by the State in the absence of an instruction that the jury may not use defendant's silence against him "rendered this case one that is closely balanced." See *Piatkowski*, 225 Ill. 2d at 567.

¶ 39    As to the alleged error, in *Sebby* our supreme court found that "[a]n instructional error may not bear upon the evidence yet may still affect the verdict because it relates to 'the manner in which a jury was instructed to evaluate that evidence.' [Citation.]" Sebby, 2017 IL 119445, ¶ 66. The *Sebby* court found that:

> "a Rule 431(b) violation may affect the verdict. If jurors do not understand and accept that the defendant is presumed innocent, then credibility contests could lean in the State's favor, which could tip the scales of justice against the defendant in a close case. Or if jurors do not understand and accept that the State bears the burden of proof beyond a reasonable doubt, then, again, credibility contests could lean in the State's favor, which also could tip the scales of justice against the defendant in a close case. A jury that does not understand and accept those principles may weigh the evidence in favor of the State or render a guilty

verdict on insufficient proof, again tipping the scales against the defendant in a close case." *Sebby*, 2017 IL 119445, ¶ 67.

¶ 40     As to the evidence in this case, after performing a qualitative, commonsense analysis of the evidence, considering the evidence in relation to the alleged error in this case, we find that the evidence "was sufficiently closely balanced so as to require a remand for a new trial." See *Piatkowski*, 225 Ill. 2d at 568 ("After carefully examining defendant's argument in relation to the facts in the record, we find that the evidence presented on these five factors did not overwhelming favor the State, and we believe that defendant has met his burden to show that the evidence was sufficiently closely balanced so as to require a remand for a new trial."). Here, the State's case relied entirely on the credibility of its two eyewitnesses. The defense strategy was clearly to attack the lack of physical evidence and the quality of the police investigation, but also to attack the credibility of the witnesses' identifications. In closing argument, defendant's attorney argued, in part, as follows:

> "[W]hat were [Jade's] words about what she said that the shooter looked like? What did she tell them [(the police)]? She said that he was dark-skinned and that he was tall and thin ***.

> * * *

> Jade Graham is half a block away where she says that she sees the sisters come out of the car and talk about 'shoot him, shoot him,' but you heard from the woman who that [*sic*] was there, Jocelyn, right? Jocelyn told you that they—when she was originally interviewed in the case, that the sisters never came out [(of the second car).] Then we know that she gave sworn testimony that she indicated the sisters didn't step out.

The same way she raised her hand, I am going to tell the truth, nothing but the truth, and then she got up here and told you a different truth. What does that make her? A liar. The State wants you to believe in a liar. The State wants you to believe that that person is telling you the truth about what they saw, and that person who was allegedly two to three feet away from the individual involved described the individual as being medium height and brown skin.

Well, we know, based upon the testimony that you heard, that the two individuals [(the victim and the shooter)]—one was six feet tall *** and then you had the officer tell you that [defendant] was five foot eleven. It is an inch difference. That's not going to appear to be too much taller or shorter. Going to be pretty much someone of the same size.

\* \* \*

[W]e are looking to determine what actually happened because we already know from the beginning we have two different descriptions of the same person who is allegedly the shooter. Completely different. One is short, brown. One is dark-skinned and tall.

This isn't a situation where there was some sort of cross-cultural identification issue. This was an African American woman looking at an African American man, and I would find it very hard to believe that they can't distinguish between what is a light-skinned brother versus a medium-complected brother versus a dark-skinned brother, but yet she was very certain he is dark-skinned, and both of them were clear that they didn't know who he was. They had never met him before.

\* \* \*

In addition, ladies and gentlemen, when they talked about how the cars came, one version is the cars come in two different directions toward each other. In the other situation they are going one behind the other.

Now, I don't know how it is that now they can give testimony that defies logic.

\* \* \*

We were told that we have two people that we need to believe in. Did the police even bother to check phone records to see if people were there, do anything to see if there is any truth to it? They said they see a video of a fight. Okay. Is there anything there?

\* \* \*

What's even more telling \*\*\* is that the woman who comes up with the whole fight theory, she tells you that she there [*sic*] on the scene. What did her friend Jocelyn say? I didn't see her. When did she come by? She came by after the ambulance came. How long did the ambulance take. One says 20 minutes. The other says five minutes. Really? You are going to screw up that much time?

She doesn't even know that the neighbor has come out to give this young man a towel. How are we to believe these individuals? Because that's what this case is about. Because we don't have anything in terms of the police investigation, in and of itself, that corroborates what was said.

\* \* \*

Who did they have to say that [defendant] was in that area at all? Two people that told two conflicting stories.

The problem is that the State, no matter what they say—they get the last word *** but what are the things they can't change? Number one, that Jocelyn is a liar. Can't change that.

[N]either one of these ladies could give you any description other than what we have. Couldn't remember clothing. *** There was none of that. Not one piece of that happen [*sic*], and those are easier things to see than the details of a human face.

Couldn't describe hair, whether it was a natural, whether it was shaven, whether there were dreads. Nothing. Nothing, and on all of this emptiness, the State's response is always going to be, but, ladies and gentlemen, they didn't tell you once, they didn't tell you twice, they told you three time [*sic*].

Here is the problem. A lie is a lie is a lie. If you are wrong, you are wrong, and the fact that you repeat the same mistakes over and over again doesn't make it true. The problem with this case, ladies and gentlemen, is that you dealt with two witnesses who, talking about the same event, couldn't give any type of description.

* * *

That's the other thing. Did either of these witnesses come to the police: oh, my God, let me tell you what I say, what happened? No. It didn't happen that way. The best friend of ten years, oh, no. I just left. Didn't even go to the hospital. Just left.

What's most telling *** is that when you do not have consistent versions, that is doubt. When you listen to this evidence, there is no way that you can determine who the person was that was involved in this shooting. *** The witnesses just compound the mess that is this case.

¶ 41    After reviewing the evidence we find that the State's case is based entirely on the jury's assessment of the credibility of the State's witnesses. Considering that at the conclusion of the case the jury did not understand and accept that it may not hold defendant's silence against him, the quantum and the quality of the State's evidence is not so overwhelming such that in the absence of the instruction the jury viewed the State's evidence less skeptically and/or weighed the State's evidence more heavily than it otherwise would and it is possible that the jury might find defendant guilty based on insufficient evidence; accordingly, we find the evidence in this case is closely balanced. *Sebby*, 2017 IL 119445, ¶ 67. See also *People v. Othman*, 2019 IL App (1st) 150823, ¶¶ 67-68 ("Othman has a constitutional right not to present evidence and not testify. The evidence can be closely balanced where the evidence comes from unreliable witnesses who offer conflicting accounts or from prosecution witnesses who provide evidence favorable to Othman. Even when the defense presents no evidence, the case can still be closely balanced.").

¶ 42    The defendant has demonstrated error and the State has conceded error in a case where we find the evidence is closely balanced. The "question here is whether a clear Rule 431(b) violation is reversible error under the first prong [of the plain error rule,] where the defendant demonstrates that the trial evidence was close." *Sebby*, 2017 IL 119445, ¶ 78. As in *Sebby*, "we conclude that, because the evidence was so closely balanced, the trial court's clear instructional

error alone may have tipped the scales in favor of the State. We choose to err on the side of fairness and remand for a new trial." *Id.*

¶ 43    Defendant's remaining issues on appeal are that (1) he was denied due process by the erroneous admission of evidence of prior consistent statements of identification of defendant in the form of testimony that Jade and Jocelyn identified defendant in a photo array and in a physical lineup; and (2) numerous allegations defendant received ineffective assistance of counsel by defense counsel's (a) failure to call an expert in the field of eyewitness identification, (b) eliciting evidence prejudicial to defendant, and (c) failure to object to prior consistent statements of identification and introduction of prejudicial identification evidence; and (3) the trial court allowed the State to present inadmissible hearsay evidence in the form of testimony about a Chicago Police Department "contact card."

¶ 44    If the State does retry this defendant, this court can only speculate as to what evidence the State will present, how it will present it, and for what purpose. Nor can we state accurately whether or when defense counsel will object and on what, if any grounds. Given that the remainder of defendant's issues involve matters that may or may not recur at retrial, under the circumstances we decline to address those remaining issues, as doing so would amount to an advisory opinion. *State by Raoul v. Hitachi, Ltd.*, 2021 IL App (1st) 200176, ¶ 51 ("Because we have determined that the trial court properly granted summary judgment in this case, we will not go on to provide an advisory opinion or consider abstract questions as to the notice requirements that are not necessary to our resolution of this appeal. [Citation.] ('As a general rule, courts of review in Illinois do not *** render advisory opinions, or consider issues where the result will not be affected regardless of how those issues are decided. [Citation.] This court will not review cases merely to establish a precedent or guide future litigation.' (Internal quotation marks

omitted.)")). See also *Business & Professional People for Public Interest v. Illinois Commerce Comm'n*, 136 Ill. 2d 192, 228 (1989) ("Any decision on our part would be premature, as the issue may not recur upon remand."); *People v. Jones*, 105 Ill. 2d 342, 353 (1985) ("The parties have briefed and argued a number of questions, but in view of our conclusion that the judgment must be reversed and the cause remanded for a new trial, we need not consider those which are unlikely to arise on retrial."); *In re Marriage of Birt*, 157 Ill. App. 3d 363, 369 (1987) ("we need not address most of the other issues raised by respondent which generally involve discretionary rulings or depend on evidentiary facts which may not be present in a retrial.").

¶ 45    Without expressing any opinion as to defendant's guilt or innocence, we find that the evidence presented at trial was sufficient to prove defendant guilty beyond a reasonable doubt; therefore, there is no double jeopardy impediment to retrial upon remand. *People v. Cox*, 2023 IL App (1st) 170761, ¶ 64 ("As the evidence presented at trial was sufficient to establish that Cox was guilty of murder on a theory of accountability beyond a reasonable doubt, his retrial on these charges presents no double jeopardy impediment. Again, this finding is only for purposes of double jeopardy, and we reach no conclusions as to Cox's guilt that are binding on retrial.").

¶ 46                                      CONCLUSION

¶ 47    For the foregoing reasons, the judgment of the circuit court of Cook County is reversed the cause remanded for a new trial.

¶ 48    Reversed and remanded.